U.S. Chief District Judge Colleen McMahon
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *People of the State of New York v. City of New York*, No. 21-cv-322 (CM) (GWG)
(S.D.N.Y.)

Saturday, January 30, 2021

Chief Judge McMahon,

Yesterday, I submitted a letter in this case about a matter that is somewhat related to the purpose

of this letter mainly insofar as it included a discussion of federal court security officer Ralph

Morales and demonstrations in 2020 against the NYPD. I incorporate that submission by

reference as though fully set forth herein pursuant to FRCP Rule 10(c). This letter motion is a

long one due to sheer necessity. If you're objective and diligent about matters, you will agree

with me about this by the time time that you finish reading it. Much of it contains screenshots

from relevant video recordings. Five days ago, you issued an order in this case (Dkt. 22) in

which you confirmed that you consolidated it with *Payne v. de Blasio*, No. 20-cv-8924

(S.D.N.Y.). That is a case in which I submitted an application on 10/26/20 to be granted

intervention as of right pursuant to FRCP Rule 24(a)(2) or permissive intervention pursuant to

FRCP Rule 24(b) in order to intervene in that case as an interested party or to appear in it as an

amicus curiae in the alternative. In response to that submission by me in that case on the very

same date when it was commenced, you have been violating my First Amendment right to have

access to the courts and to receive information about the determination on the merits that you

would make about that submission by me. In doing so, you have also been violating my

Fourteenth Amendment due process and equal protection rights by ignoring that application with

respect to the fact that other federal court judges opt to diligently uphold fundamental constitutional rights by properly responding to such applications in a timely manner and issuing determinations on the merits in response to them.

I'm now filing this letter mainly to be granted intervenor or amici status in this case after having recently learned about it after it was commenced relatively recently. As was the situation with my application in *Payne*, I seek to be granted intervention as of right pursuant to FRCP Rule 24(a)(2) or permissive intervention pursuant to FRCP Rule 24(b) in order to intervene in this case as an interested party or to appear in it as an amicus curiae in the alternative. Yesterday, Bill de Blasio ("the Mayor") released a State of the City address in his capacity as a con artist and the illegitimate and bastard New York City Mayor. This is a very relevant point in this letter. He did so after members of his NYPD security detail and Community Affairs Unit ("CAU") as well as members of the New York City Council ("City Council"), Letitia James, whistleblower news censors in journalism, New York State Supreme Court judges, New York State court officers, the New York City Civilian Complaint Review Board ("CCRB"), New York City Department of Investigations ("DOI"), Manhattan District Attorney's Office, U.S. Department of Justice, and New York State Attorney General's Office, and others acted in concert and otherwise on their own in 2017 through their acts and omissions that ultimately enabled the 2017 New York City government elections to be stolen as a result of voter suppression, voter fraud, whistleblower retaliation while I had ongoing and multifaceted litigation against the City of New York that enabled the Mayor and his supporters to keep their jobs and otherwise gain access to career advancement opportunities in flagrant violation of numerous laws that partly include **a)** the Hatch Act (5 U.S.C. §1502(a)(1)), **b)** subsections (2) thru (4) and (9)(a) within New York City Charter §2604(b) that are related to violations of the Hatch Act, and New York City Charter

§1116. I can clearly and overwhelmingly substantiate what I just asserted through a variety of information that partly consists of video recordings, e-mail messages, eyewitness accounts, photographs, and audio recordings. By stealing those elections, the Mayor, members of the City Council, Ms. James, and others continued to be obsequious servants of the NYPD's criminal mob and facilitated its terrorism by longstanding apathy, complacency, and approval of its actions before that mob's terrorism exploded in New York City in 2020 and gave rise to this case. If not for the theft of those elections in 2017, it's possible that other people may have emerged long before now to properly throw away the trash that existed among the government personnel and censors in journalism to which I just referred to immediately hammer non-negotiable, long overdue, and decisive reforms into place throughout the NYPD's mob that would have prevented much of the terrorism that the NYPD's mob committed in 2020. If that had occurred, then this case would largely be moot.

Contrary to your remarks in your 1/25/20 order in this case, the demonstrations that occurred in New York City during 2020 that this case and those that have been consolidated with it were about weren't strictly about the Black Lives Matter ("BLM") movement and the deaths of George Floyd and other individuals at the hands of people who have been wearing law-enforcement costumes in other jurisdictions. I know this for a fact because I lawfully participated in and otherwise observed some of those demonstrations firsthand as an unofficial legal observer. I'm not Black and I haven't been killed. I have repeatedly both gone toe-to-toe with past and present criminals in the NYPD and prevailed against them through legal self-defense and as a result of litigation. Concerning this point, the next screenshot shows NYPD Officer Santori (badge #: 31854) shortly after he illegally assaulted me on 6/3/20 by grabbing my arm while I lawfully stood in the intersection of Fourteenth Street and Eighth Avenue in Manhattan during a

demonstration with many others against the NYPD, Mayor, and others that wasn't limited to issues about the Black Lives Matter movement.



Immediately after Mr. Santori illegally grabbed my left arm on 6/3/20, I recorded a video recording of him with my cell phone at 4:31 pm on that date that is available on the Internet at https://drive.google.com/file/d/14-9eodGearw6ELlUeyXDGRDyNoHiSYzS/view?usp=sharing that confirms that I justifiably and lawfully expressed my outrage at him in response to his unprovoked and entirely illegal assault against me. The next screenshot from that video confirms that he was then had a NYPD body-camera positioned over an area of his NYPD uniform to illegally violate my First Amendment right to receive information from all available sources by preventing me from being able to see his name and NYPD badge number that were imprinted on his shirt directly behind that body camera as it appeared to be recording video as shown by the

fact that it's red light was illuminated. During the 2020 demonstrations against the NYPD in New York City, many members of that criminal mob repeatedly and illegally concealed information about their identities on their uniforms and NYPD badges. I even spotted a male member of the NYPD who wore a NYPD helmet with a NYPD badge number that was different than the number that was shown on his NYPD badge. Such flagrant deception that was so easy to spot confirms that the NYPD can't be accused of having intelligence.



The next screenshot from that video shows the copy of the decision that U.S. District Judge Lorna Schofield issued on 9/30/19 in the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that is hereinafter referred to as "K1" in which I'm the plaintiff that I commenced in April of 2018.



Her 9/30/19 decision was mostly in my favor, though she also issued patently fraudulent, premature, prejudicial, and erroneous findings in it to my detriment in her capacity as a dutiful and subservient cat's paw of the defendants and opposing attorneys in that case. She did so by

illegally ignoring substantial and material eyewitness accounts, evidence, and court decisions that I can fully, readily, and overwhelmingly substantiate. I participated in that particular demonstration on that date primarily to serve as a legal observer against the NYPD for the benefit of the public at the same time that I presciently anticipated that I would be able to catch members of the NYPD's criminal mob committing illegal acts and omissions against me during it. The following is a relevant excerpt from _Securities & Exch. Com'n v. Management Dyn., Inc._, _515 F.2d 801 (2d Cir. 1975)_ about this point that concerns recidivistic behavior by the NYPD's criminal mob and its supporters by their acts and omissions:

"the commission of past illegal conduct is highly suggestive of the likelihood of future violations."

The next screenshot from that video shows NYPD Deputy Inspector McGeown as he stood near Mr. Santori and illegally stonewalled me in response to remarks that I made to him about wanting to file a complaint with the NYPD against Mr. Santori for having just assaulted me while he was nearby in that intersection.



Mr. McGeown fraudulently claimed to me that I was then in that street illegally at the same time that he and other members of the NYPD's criminal mob were lying about that while they were blocking vehicular traffic along Eighth Avenue from moving North as the phalanx of demonstrators and legal observers that I was among were walking along Fourteenth Street in the direction of the Hudson River. Moreover, this screenshot and what appears throughout that short video confirms that Mr. McGeown, Mr. Santori, and many other members of the NYPD criminal mob nearby illegally weren't then wearing face coverings during the ongoing Covid-19 pandemic. In hindsight, I should have immediately engaged in legal self-defense against Mr. Santori on 6/3/18 by breaking the hand and wrist that he used to grab me. I should have similarly engaged in legal self-defense against anyone and everyone who may have thereafter deliberately initiated physical contact with me that I wouldn't have appreciated. *Jackson v. City of New York,*

939 F. Supp. 2d 235 (E.D.N.Y. 2013) is among other court decisions that confirm that self-defense against the NYPD is legal.

In regards to this application, the letter motion that I submitted on 6/4/20 (Dkt. 374) to Judge Schofield in K1 confirms that I informed her very clearly in it about what I just discussed about Mr. Santori and Mr. McGeown as I sought to be granted immediate relief about that on the merits. However, she arbitrarily and capriciously denied that application by refusing to allow that 6/3/20 matter to be a part of K1. She did so in spite of the fact that the 6/3/20 matter clearly related back to and amplified the illegal acts and omissions that were committed against me on 4/27/17 partly on a public sidewalk in Queens that is a traditional public forum as I was then criminally assaulted by NYPD Officer Rafael Beato (badge # 13326) by being shoved in my chest 3 times. That occurred shortly before he and 3 other members of the NYPD's criminal mob that included 2 members of the Mayor's NYPD security detail illegally subjected me on that sidewalk to what is now known as the NYPD's illegal practice that is named "kettling" and "encirclement". They did so as I sought to lawfully talk with the Mayor from a sufficient distance away partly about the fact that **a)** Mr. Beato had just criminally assaulted me, **b)** I was being illegally prevented by 4 members of the NYPD's mob in violation of my constitutional rights to return to the exact spot on that public sidewalk where I lawfully stood when Mr. Beato first shoved me, and **c)** NYPD Inspector Howard Redmond illegally prevented me from attending the public town hall meeting that members of the public conducted with the Mayor, New York City Human Resources Administration ("HRA") Commissioner Steven Banks ("Mr. Banks"), New York City Councilman Jimmy Van Bramer, other government personnel, and others in Long Island City in Queens in a public school is controlled by the New York City Department of Education ("DOE"). Findings in *Bloomberg v. the New York City Department of*

*Education*, No. 17 Civ. 3136 (PGG) (S.D.N.Y. Sept. 24, 2019) confirm the Mayor's Office and Mr. Van Bramer were required to have invited their political rivals to attend that town hall meeting in order for that town hall meeting to have been able to be conducted in that school. However, there is no reason to believe that the Mayor's Office and Mr. Van Bramer complied with that binding legal prerequisite and that means that they illegally conducted that town hall meeting in that school on 4/27/17 while Mr. Redmond and others violated my constitutional rights directly outside of that school. Oops.

Mr. Redmond is the head of the Mayor's NYPD security detail and was the primary defendant in the case of *Dietrich v. City of New York*, No. 18-cv-7544(CM)(S.D.N.Y.) to which you were assigned before you dismissed it in Mr. Redmond's favor when you should have instead ruled in Mr. Dietrich's favor long after I talked with both Mr. Redmond and Mr. Dietrich to know that Mr. Dietrich complies with applicable law far more often than Mr. Redmond. When I sought to talk with the Mayor on the sidewalk in Long Island City on 4/27/17 that was adjacent to the school that hosted the Mayor's 4/27/17 town hall meeting that I discussed above, I sought to do so as he left that town hall meeting and crossed that sidewalk as I correctly guessed where he would leave that school and cross that sidewalk at the end of that event to be driven away from there. However, Mr. Beato, NYPD Officer Yu Lie (Tax ID #960813), and NYPD Detective Raymond Gerola (badge #6577) and NYPD Lieutenant Ralph Nieves illegally formed a wall around me with their bodies as they positioned themselves in extremely close proximity to me that prevented me from being able to see the Mayor as he left that school and crossed that sidewalk in flagrant violation of my constitutional rights and other applicable laws. Mr. Gerola and Mr. Nieves were then members of the Mayor's NYPD security detail. Mr. Nieves has since retired from the NYPD's mob. The next screenshot shows Mr. Redmond in a video recording

that I recorded with my cell phone at 7:27 pm on 4/27/17 that is available on the Internet at

https://drive.google.com/open?id=1rcpbI2ePp7r2k2fzFgp-zAHBGq8nE_J9 as he illegally

prevented me from attending that town hall meeting. I recorded that video near the entrance to

the school that was used to provide access to the public to that town hall meeting.



He prevented me from attending that town hall meeting after I registered in advance with the

Mayor's Office to attend it, was among the first 30 members of the public to wait on line next to

that school on 4/27/17 to be granted access to it to attend that town hall from within the room in

which it would be conducted, was issued an admission ticket by a female member of the Mayor's

staff on 4/27/17 as I waited in that line, and conducted myself in an entirely lawful manner

throughout the entire period that I was at that location on 4/27/17.  As shown in the screenshot

above, Mr. Redmond used a metal barricade, an illegal show of authority to prevent me from

attending that town hall meeting that was a public forum as I then had ongoing litigation against HRA that I commenced that Judge Schofield fraudulently omitted information about in her 9/30/19 decision in K1. Mr. Redmond also used a totally fraudulent pretext to cause me to be illegally barred from attending the Mayor's 4/27/17 town hall as he lied to my face by claiming that he observed something about interactions that I previously had with Mr. Banks that never occurred and refused to substantiate his claim about that when I immediately ordered to do so because I instantly knew that he was lying. Also, the City of New York illegally didn't preserve video recordings that were recorded between 5:30 pm and 6:30 pm by a video security camera that was controlled by DOE that was installed by the entrance to that school that is shown in the preceding screenshot. This is entirely true and accurate in spite of the fact that I reported an extremely timely telephone complaint on 4/27/17 at roughly 7:31 pm against Mr. Redmond to the utterly useless CCRB while Maya Wiley was its chairwoman and the CCRB was otherwise controlled by the Mayor. This point pertains to the e-mail discussion shown next that I had with a member of the CCRB on 5/18/20 about the extent to which the CCRB attempts to collect relevant evidence in response to complaints that are reported to it against members of the NYPD. In short, the CCRB inexcusably shirked its duty to have contacted the DOE to get the entirety of the video recordings that were recorded of me on 4/27/17 while I was at the site of the public town hall meeting that the Mayor conducted in Long Island City in Queens.

**From:** "De Angelo, Ethan (CCRB)" <edeangelo@ccrb.nyc.gov>
**Subject:** Re: Status update for CCRB complaint # 201902372
**Date:** May 18, 2020 at 4:02:54 PM EDT
**To:** Towaki Komatsu <towaki_komatsu@yahoo.com>

Mr. Komatsu,

We welcome any evidence civilians are will to provide to us, but we do not rely on civilians to conduct investigations for us.  When we determine it necessary, we reach out

to other city agencies and non-government businesses to obtain evidence, whether that be in the form of video footage, witness statements, of documentation.

Ethan De Angelo
Investigative Manager
NYC Civilian Complaint Review Board
100 Church Street, 10th Floor
New York, NY 10007
Tel: 212-912-2033

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Sent:** Monday, May 18, 2020 3:44 PM
**To:** De Angelo, Ethan (CCRB) <edeangelo@ccrb.nyc.gov>
**Subject:** Re: Status update for CCRB complaint # 201902372

Thanks. But does the CCRB rely on those who report complaints to it to furnish video evidence to it directly that is available from sources that include city agencies or does the CCRB directly contact such agencies to get such evidence without needing the complainants to get that evidence for the CCRB?

The next 2 screenshots are from the elapsed time of roughly 1 minute and 37 seconds in a video recording that I recorded with my cell phone on 5/29/20 at 4:11 pm that is available on the Internet at

https://drive.google.com/file/d/1SgzuF6EvPefagJwT1STz82QIA7e3HwDa/view?usp=sharing

that show Mr. Redmond on 5/29/20 as he stood in the intersection of Pearl Street and Centre Street near the Thurgood Marshal ("TM") federal courthouse during a demonstration by a large number of members of the public against the Mayor, NYPD, and other criminals who masquerade as law-enforcement personnel that partly includes New York State court officers, the U.S. Marshals Service ("USMS"), and federal court security officers ("CSOs") who are assigned to federal courthouses in New York City that partly include Ralph Morales who defended Eric Garner's NYPD murderer. In the first screenshot from that video, I'm holding a copy of Judge Schofield's 9/30/19 decision in K1 as Mr. Redmond is shown on the left with eyeglasses on his forehead as he wore a face covering next to NYPD Officer Christopher Pizzo of the Mayor's

NYPD security detail as he wore a blue jacket and also wore a face covering.



The next screenshot from that video more clearly shows Mr. Redmond as he bumped his arm

with another member of the NYPD's criminal mob whose last name is McGinn and I recorded

another video recording of on 5/29/20 as he behaved in an irate manner in Centre Street near me and other members of the public near Canal Street while we were conducting ourselves in a peaceful manner.



The next screenshot is from the elapsed time of 22 seconds in another video recording that I recorded with my cell phone on 5/29/20 at 3:44 pm on Centre Street near Canal Street that shows Mr. McGinn behaving in an irate fashion as he and other members of the NYPD's criminal mob engaged in illegal selective-enforcement in flagrant violation of my Fourteenth Amendment and First Amendment rights as well as those of other members of the public by not letting us engage in a peaceful demonstration in that street against the NYPD, the Mayor, and others. That video

recording is available on the Internet at

https://drive.google.com/file/d/1uCNXZ_Wt9IUc962sJwbJHDZrnNDUNrLd/view?usp=sharing



The 15 screenshots that appear in the table shown next are from the same video that the preceding screenshot is from. I have added information below each of those screenshots in that table that identify their elapsed time in that video and relevant comments about what is shown and heard in that video then.



**a)**

**Elapsed time**: 12 seconds

**Comment**: A male who shortly thereafter told me his first name is Jonathan as he was being accosted by a male NYPD Officer whose last name is Sanfilippo who was illegally not wearing a face covering and was also using a band to illegally cover his NYPD badge number in flagrant violation of my First Amendment right and that of Jonathan's to have then seen that information. Members of notorious units within the NYPD that are known as TARU and the Strategic Response Group were then gathered nearby like snakes and rats.



**b)**

**Elapsed time**: 16 seconds

**Comment**: This shows Jonathan as Mr. Sanfilippo seized him near his left elbow that was illegal on the grounds that Mr. Sanfilippo was equitably estopped from being able to do so while he was illegally covering his NYPD badge number and not wearing a face covering.



**c)**

**Elapsed time**: 18 seconds

**Comment**: This shows Jonathan's left arm being seized by Mr. Sanfilippo.



**d)**

**Elapsed time**: 19 seconds

**Comment**: This shows someone whose NYPD badge indicated his last name is Spinella and that he worked for the NYPD as a Chief of support services. I talked with him roughly 20 minutes earlier in front of the NYPD's headquarters as I asked him and other members of the NYPD's mob why they were engaging in selective-enforcement by ignoring a ban that then existed that was applicable to mass gatherings of people. When I talked with him then, a large number of demonstrators were assembled in front of the NYPD's headquarters and I recorded that conversation on video.



e)



f)

**Elapsed time**: 27 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was grabbing the back of Jonathan's shirt while Mr. Sanfilippo clearly was illegally both not wearing a face covering and using a band to hide his NYPD badge number on his NYPD badge.

**Elapsed time**: 30 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was seizing him with his left arm and hand.



g)



h)

**Elapsed time**: 30 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him with his left arm and hand as Jonathan's eyes communicated very clearly that he would have preferred for Mr. Sanfilippo to have been engaging in social-distancing with him.

**Elapsed time**: 32 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him as Jonathan and I briefly talked shortly after I had just asked him his name.

 

**i)**

**Elapsed time**: 32 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him as Jonathan told me first name again.

**j)**

**Elapsed time**: 32 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him and right before Mr. Sanfilippo prevented me from asking for Jonathan's last name and contact information by suddenly twisting Jonathan to the other side of his body and ushering him away from me.

 

k)

**Elapsed time**: 33 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him as tightly as a bribe.

l)

**Elapsed time**: 33 seconds

**Comment**: This shows Mr. Sanfilippo and Jonathan as Mr. Sanfilippo was still seizing him as tightly as a bribe.





**m)**

**Elapsed time**: 34 seconds

**Comment**: This shows Jonathan and Mr. Sanfilippo as Mr. Sanfilippo coerced Jonathan to leave that roadway as another member of the NYPD's criminal mob who was wearing sunglasses and riding a NYPD scooter was nearby (shown on the left) as he illegally was also using a band to cover his NYPD badge number and not fully using a face covering by not having it cover his nose.

**n)**

**Elapsed time**: 35 seconds

**Comment**: This shows the male member of the NYPD's criminal mob more clearly to him I just referred.



**o)**

<u>**Elapsed time**</u>: 36 seconds

<u>**Comment**</u>: This shows Jonathan and Mr. Sanfilippo as Mr. Sanfilippo continue to seize him.

The next screenshot is from the very beginning of a video recording that I recorded with my cell phone on 5/29/20 at 5:25 pm on Centre Street near the Manhattan Criminal Courthouse and shows a man wearing a gray shirt as he sat in the middle of Centre Street without any member of the NYPD making an effort to have him leave that roadway.



A question that is naturally raised by this is why exactly was Jonathan seized by Mr. Sanfilippo for standing in Centre Street near there at roughly 3:44 pm in violation of his Fourth Amendment, First Amendment, Fifth Amendment, and Fourteenth Amendment rights? When I recorded those video recordings on 5/29/20, GPS was active on my cell phone to show the approximate location where I stood as I recorded them. During the pandemic, the NYPD and New York City Mayor's Office have both illegally closed public streets in New York City and allowed obstructions to illegally exist on public sidewalks in New York City that are traditional public forums. By doing so, they have violated the Americans with Disabilities Act as well as my rights pursuant to the First Amendment, Fifth Amendment, and Fourteenth Amendment. In fact, the NYPD criminal's mob continues to illegally have metal barricades setup near the Daniel Patrick Moynihan ("DPM") federal courthouse, TM, and New York State Supreme Court in Manhattan that is located at 60 Centre Street. The setup of those barricades and other obstructions that partly includes outdoor dining setups on public sidewalks directly violates New York Administrative Code §16-122(b) and illegally and quite literally impedes my First

Amendment right of access to the courts. On a related note, a news organization named the Richmond Free Press published a news article entitled "ACLU Lawsuit Against Police Action During Summer Protest Dismissed" on the Internet on 1/28/21 at http://richmondfreepress.com/news/2021/jan/28/aclu-lawsuit-against-police-action-during-summer-p/ that was written by George Copeland, Jr. in which that article reported that a judge named Judge Beverly Snukals dismissed a lawsuit that the ACLU commenced on behalf of a group of students who police assaulted while they conducted a peaceful protest on 6/23/20 as those demonstrators used a barricade to close a street and provide information among those who were assembled there pursuant to their First Amendment rights partly about police brutality. That article was reported long after the NYPD began illegally and consistently closing off both St. Mark's Place and a street next to New York University's Law School in Manhattan in 2020 to vehicular traffic.

The reason why the preceding discussion about how the NYPD and Mayor's Office have been repeatedly violating laws that prohibit obstructions in public streets, near the DPM, and on public sidewalks is because that showcases that the Mayor's Office and NYPD engaged in illegal standardless discretion to violate the Fourteenth Amendment and First Amendment countervailing rights of demonstrators and legal observers in 2020 to peacefully demonstrate, and/or observe such demonstrations in public streets and elsewhere partly as the Mayor and NYPD imposed an illegal curfew on New Yorkers while illegally discriminating in favor of people who worked in the journalism industry that includes many whistleblower news censors. The point pertains to the following controlling finding from the U.S. Supreme Court's decision in *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978):

"the Constitution provides the press with no greater right of access to information than that possessed by the public at large"

The preceding excerpt from _Houchins_ is reinforced by the following findings from _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) that confirms that the press has no greater right to access a courtroom and court filings than the public that is particularly applicable in this case on account of the constraints that exist due to the ongoing Covid-19 pandemic:

> "The First Amendment generally grants the press no right to information about a trial superior to that of the general public. "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public."

The next screenshot is from the elapsed time of 37 seconds in a video recording that I recorded with my cell phone on 5/29/20 at 5:03 pm that is available on the Internet at

https://drive.google.com/file/d/1r5GfTmqC6MMrd5eH-p-RqjoQ_pfzHwda/view?usp=sharing as I stood across the street from the New York State Supreme Court that is located at 80 Centre Street in Manhattan as a large group of demonstrators against the NYPD, the Mayor, and others marched in Centre Street toward Canal Street partly in support of the Black Lives Matters movement and partly in relation to Eric Garner and George Floyd.



The preceding screenshot clearly shows that I was then holding a copy of Judge Schofield's 9/30/19 decision in K1 as I did so to clearly tie my presence then and there to the sum and substance of my claims in K1 that are also against the NYPD and Mayor's administration. The TM appears in the background in that screenshot. The next screenshot is from the elapsed time of

9 seconds in that video and confirms that the 2020 demonstrations in New York City that were partly about George Floyd and Black Lives Matter were not strictly about that and not just above abuse by law-enforcement personnel against Black people.



The next screenshot is from the elapsed time of 9 seconds in a video recording that I recorded with my cell phone on 5/29/20 at 4:06 pm that is available on the Internet at

https://drive.google.com/file/d/1r5GfTmqC6MMrd5eH-p-RqjoQ_pfzHwda/view?usp=sharing as

I stood near the New York City Civil Court in Manhattan that is located at 111 Centre Street and

walked along a public sidewalk towards Foley Square as I briefly walked alongside Mr.

Redmond and Mr. Pizzo that I discussed earlier in this letter.



When we first met then and there, I disingenuously asked him how he was before he instinctively

greeted me while unaware that it was me who asked him that. He then quickly walked away.

Before he did so, I asked him about what was going on in that area as I was then referring to the

fact that the NYPD was illegally cracking down on peaceful demonstrators in Centre Street after

he testified in June of 2018 under oath in *Sherrard v. City of New York*, No. 15-cv-7318

(MAB)(KNF) (S.D.N.Y. Jun. 13, 2018) that he respected the right that people have to protest and

demonstrate. He didn't answer that question of mine on 5/29/20.  At the elapsed time of 19

seconds in that same video, I began talking to Mr. Pizzo while walking alongside him as I

sarcastically asked him if he would like to read information that I then had with me about K1 that

is partly against Mr. Redmond. Also, at the elapsed time of 29 seconds in that video, I'm heard

telling Mr. Pizzo that a member of the NYPD put his hands on me on that same date. When I told

him that, I was referring to the fact that a member of the NYPD who later told him that he was

NYPD Detective Sandoval (badge # 5841) put his left hand on me at the elapsed time of roughly

1 minute and 45 seconds in a video recording that I recorded with my cell phone on 5/29/20 at

3:36 pm as we walked along the public sidewalk in front of the New York State Supreme Court

at 80 Centre Street in Manhattan in the direction of Canal Street.    That video recording is

available on the Internet at

https://drive.google.com/file/d/1_EuILf8sVqExXcH8ORtu7f_S_Sa4hFM0/view?usp=sharing.

The next screenshot is from the elapsed time of 1 minute and 45 seconds in that video and clearly

shows Mr. Sandoval right before he put one of his hands on me that occurred immediately after I

just asked him about why a member of the public near us had just been shoved to the ground by

members of the NYPD. I began that question to him at the elapsed time of roughly 1 minute and

38 seconds by asking him if he was a member of the NYPD.



The next screenshot is from a fraction of a section after the elapsed time of 1 minute and 45

seconds in that video and shows part of Mr. Sandoval's left hand in the lower-right corner

immediately after he just illegally made contact with me with that hand that I should have

immediately broken by engaging in legal self-defense.



At the elapsed time of 1 minute and 56 seconds in that video, I'm clearly heard loudly asking Mr.

Sandoval to tell me his name. In response, he ignored me and walked away. The fact that he

ignored my request and began walking away is sufficient to objectively and reasonably infer

from the totality of the circumstances that he didn't want to tell me his name then to avoid

possibly getting in trouble for having just initiated physical contact with me in the immediate presence of members of the public who could potentially serve as witnesses on my behalf about that. At the elapsed time of 1 minute and 58 seconds in that video, a member of the public is heard loudly beginning to tell Mr. Sandoval that I just asked him for his name and that he couldn't deny me that information. That member of the public told him that more than 3 times as I walked behind Mr. Sandoval as he continued to refuse to tell me his name.  I thereafter immediately told at least 2 members of the NYPD in that immediate vicinity that I wanted to report a complaint against Mr. Sandoval for having put one of his hands on me. However, they refused to take a complaint from me then and there. The next screenshot is from the elapsed time of 2 minutes and 33 seconds in that video and shows Mr. Sandoval as I ordered him to tell me his name and NYPD badge number while we stood in Centre Street near a small part that is adjacent to the New York City Civil Court at 111 Centre Street. At the elapsed time of 2 minutes and 36 seconds in that video, Mr. Sandoval is heard telling me his last name and NYPD badge number. However, he never showed me anything (such as a NYPD badge) that would have otherwise enabled me to independently verify that to try to make certain that he wasn't lying to me about his identity.



The next screenshot is from the elapsed time of 1 minute and 16 seconds in that video and shows the area on the sidewalk in front of where I was then walking where a member of the public had just been shoved to the ground by members of the NYPD before I thereafter asked Mr. Sandoval why that person was shoved to the ground. Right after Mr. Sandoval put one of his hands on me immediately after I asked him about, I promptly and lawfully confronted him for putting one of his hands one me. In response, he lied by denying that he put one of his hands on me and fraudulently claimed that I had made physical contact with him instead. I certainly hadn't done

so.



The case of _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(KNF) (S.D.N.Y. Jun. 13, 2018)

that I discussed earlier in this letter was an entirely valid lawsuit that was commenced against

Mr. Redmond in which he lied as he testified at trial in that case by claiming that he respects the

right that people have to demonstrate and protest. He also committed perjury on 5/19/17 in a sworn deposition that he gave in connection with that case. Mr. Redmond also illegally put one of his hands on me on 4/27/17 as he was illegally preventing me from attending the Mayor's 4/27/17 town hall meeting in Queens. Mr. Redmond illegally again put his hands on me on 7/25/17 inside of the subway station that is located below Broadway near New York City Hall by Murray Street on the uptown platform as the Mayor was illegally conducting a publicity stunt in that subway station in a manner and location in it that was in violation of the MTA's rules. Mr. Redmond illegally put his hands on me then and there by illegally seizing me in flagrant violation of my constitutional rights as I was lawfully engaged in criticism and whistleblowing against the Mayor and his administration while I was physically separated from where the Mayor stood by a vertical metal partition. Mr. Redmond's illegal seizure of me on 7/25/17 occurred in full view of a large number of whistleblower news censors in journalism as they assembled like obsequious rats and snakes in front of and otherwise around the Mayor near me as they were on the other side of that vertical metal partition.

The next screenshot is from a Twitter posting that was posted on the Internet at https://twitter.com/TweetBenMax/status/889963675372617730 on 7/25/17 at 5:40 pm by a whistleblower news censor in journalism named Ben Max who works for an organization named Gotham Gazette. That Twitter posting was posted on the Internet by a Twitter account that is registered to Mr. Max that has the username of "@TweetBenMax". That screenshot shows both the text in that Twitter posting and a photograph that was included in it as Mr. Max made it clear that the Mayor stupidly chose to conduct a publicity stunt in a subway station during rush hour in which noise from subway trains made it difficult for him to be heard. I'm shown in the photo in that screenshot as I stood next to NYPD Detective Christopher Fowler on the uptown subway

platform in an area that was behind the Mayor's back and near a vertical and white metal pole as I spoke into Mr. Fowler's right ear as Mr. Fowler's back faced the camera that took that photo. The fact that the Mayor was then using a microphone and podium for that publicity stunt and conducting it near a staircase all violated the MTA's rules. In contrast, the MTA's rules authorize public speaking in subway stations and that is exactly what I was lawfully doing when Mr. Redmond illegally seized me while he and other members of the NYPD's criminal mob were illegally allowing the Mayor, the press, and members of the Mayor's staff to illegally obstruct the movements of people in that subway station. No one reported about the fact that Mr. Redmond seized me in that subway station.



J. David Goodman of the New York Times, Jillian Jorgensen of Spectrum News, Harry Goldman of Bloomberg News, Matthew Chayes of Newsday, and Mara Gay of the New York Times are

whistleblower news censors in journalism who are shown near the Mayor and I in the preceding

photograph from that Twitter posting.

The next screenshot clearly shows Mr. Redmond as he illegally seized me by seizing my left arm

in that subway station on the uptown subway platform in flagrant violation of my rights pursuant

to the Fourth Amendment, First Amendment, Fifth Amendment, and Fourteenth Amendment as

well as additional applicable laws. That screenshot clearly shows a staircase behind the Mayor

and corresponds to the elapsed time of 10 minutes and 18 seconds in the video recording that the

Mayor's Office arranged to be recorded of that illegal publicity stunt that is available on the

Internet at https://www.youtube.com/watch?v=Hq2Q4tPrN2A.



The next screenshot is from a Twitter posting that was posted on the Internet at

https://twitter.com/chayesmatthew/status/889968793434370050 on 7/25/17 at 6:01 pm by a

Twitter account that has the username of "@chayesmatthew" that is registered to Matthew

Chayes. That posting includes 2 photographs that together with the text in that posting indicate

that the Mayor was illegally causing a subway train to be delayed as he was illegally doing a

photo-op in the subway train that he took immediately after he completed his illegal publicity

stunt in that subway station.



The member of the NYPD's criminal mob who appears in the first photograph on the left in the

preceding screenshot is NYPD Captain Richard Taylor. His LinkedIn profile that reflects his

career is available on the Internet at https://www.linkedin.com/in/richard-taylor-3b1576165/. I

have reason to believe that he was personally involved in illegally causing the subway train that

is shown in the preceding screenshot to be held in that subway station for the Mayor's benefit on

7/25/17. I also talked with him on 7/25/17 as he and Mr. Redmond illegally coerced me to move

away from the area where the Mayor would shortly thereafter conduct his publicity stunt in that

subway station in front of whistleblower news censors in journalism. I recorded my initial

conversations with Mr. Taylor and Mr. Redmond on video that I had with them on 7/25/17 in

that subway station. On 11/19/20, a news organization named Hamodia published a news article

that is entitled "NYPD's Highest-Ranked Yarmulke-Wearing Officer Getting Promotion" that

was written by Reuvain Borchardt. That article is available on the Internet at

https://hamodia.com/2020/11/19/nypds-highest-ranked-yarmulke-wearing-officer-getting-

promotion/ and reported that Mr. Taylor receive a promotion in the NYPD's criminal mob after

he flagrantly violated my constitutional rights on 7/25/17 inside of the subway station near City

Hall as I told him that he was doing so then.

The next screenshot is from a Twitter posting that was posted on the Internet at

https://twitter.com/JoshEiniger7/status/889970550025723904 on 7/25/17 at 6:08 pm by a Twitter

account that has the username of "@JoshEiniger7" and is registered to a whistleblower news

censor named Josh Einiger who works for ABC News.



That posting includes a video recording that shows Mr. Redmond and the Mayor inside of the

subway train that they took immediately after the Mayor's illegal publicity stunt in that subway

station on that date. NYPD Sergeant Gilot Lemorin is shown in the lower-right corner of the

preceding screenshot as he wore an earpiece in his right ear while he stood directly outside of

that train with his back facing it in a manner that clearly suggested that he and Mr. Redmond

were personally involved in having illegally delayed that subway train from having its doors

closed and leaving that subway station. The text in that posting confirms that the Mayor was

conducting a photo-op on that subway train. That video clearly shows Mr. Redmond making a

remark to someone immediately before the doors for that subway train closed and that train left

that subway station. That further suggests based on the totality of the circumstances that Mr.

Redmond was personally involved in having illegally caused that subway train to have been delayed from leaving and its doors from being closed. That video confirms that Mr. Redmond was then wearing an earpiece by his left ear that was presumably to engage in radio communications. Concerning this point, a journalist named Melissa Russo of NBC New York wrote a news article that is entitled "City Hall Pushes Back as MTA Head Investigates Reports Mayor Held Subway Train for Himself" that was published on the Internet at

https://www.nbcnewyork.com/news/local/city-hall-reports-subway-train-held-for-mayor-de-blasio-mta-chair-lhota/226575/ on 7/27/17 about the fact that members of the NYPD illegally caused the down subway train to be held in the subway station to facilitate the Mayor's ability to board it and conduct a publicity stunt in it to the detriment of other passengers who were on that train and otherwise waiting for its arrival in other subway stations. When asked about reports that members of the NYPD illegally intervened to delay that subway train on 7/25/17 in that subway station near City Hall, the Mayor was recorded on video telling reporters that he didn't care about that and that it didn't matter that causes municipal liability to apply to the illegal delay of that train because of his tacit approval of that. One of the reasons why this discussion about that 7/25/17 subway incident is relevant to my application to intervene in this case is because members of the NYPD illegally closed subway station entrances and exits during the 2020 demonstrations that were partly against the NYPD that occurred in May and thereafter to illegally hinder the ability that New Yorkers had to meet up with demonstrators, legal observers, and journalists at those demonstrations. I personally experienced that while trying to exit the subway station near Brooklyn Bridge in Manhattan during a demonstration and trying to enter the subway station at Union Square during a fierce rainstorm at around the same time that a demonstration occurred nearby. In short, the NYPD illegally engaged in an abuse of power by

closing those subway exits and entrances during those demonstrations in violation of First Amendment and Fourteenth Amendment rights. I took photographs and/or recorded video recordings that prove this.

Judge Schofield and U.S. Magistrate Judge Gabriel Gorenstein issued orders on 7/28/20 and 8/10/20 in K1 in which they used a fraudulent pretext to engage in First Amendment retaliation against me as they illegally refused to allow me to assert claims in K1 about Mr. Redmond's illegal seizure of me on 7/25/17 as well as many additional claims and defendants that all related back to, clarified, and/or amplified what were my existing set of claims and defendants in K1 prior to 7/1/17. Judge Gorenstein did so after hindsight confirms that he did a lousy job while he worked as General Counsel for HRA in the 1990s. Illegal acts by HRA personnel in April of 2017 in litigation that I commenced against HRA as well as HRA having illegally subjected me to an illegal bait-and-switch fraud and forgery concerning an apartment lease that I signed on 2/16/16 that caused me substantial and irreparable harm are directly related to and inextricably intertwined with my claims in K1. Judge Gorenstein's prior employment with HRA and the jobs that he held with HRA required him to disqualify himself from K1 for reasons that are comparable to why U.S. District Judge Louis Stanton recused himself in _Straw v. Dentons US LLP_, No. 20 Civ. 3312 (LLS) (S.D.N.Y. June 29, 2020) to avoid the appearance of impropriety, partiality, bias, prejudice, and a patently clear conflict of interest. However, Judge Gorenstein has contumaciously refused to recuse himself from K1 simply he can make certain that he can continue to illegally railroad the proceedings in it to my detriment instead of uphold my constitutional right to a fair trial.

Through their orders on 7/28/20 and 8/10/20 in K1, Judge Schofield and Judge Gorenstein

illegally rejected the proposed third amended complaint that I submitted in K1 in the form of

multiple pleadings to serve as a consolidated operative amended complaint. Findings in _Carilli v._

_Semple_, No. 3: 19-cv-01922 (JAM) (D. Conn. May 1, 2020) and _Williams v. Metro-North_

_Railroad_, No. 17-cv-3092 (KMK) (S.D.N.Y. Mar. 27, 2020) confirm that I had a clear

Fourteenth Amendment equal protection and due process right as well as a First Amendment

right to have prepared and submitted my proposed third amended complaint in K1 in the form of

a consolidated amended complaint that was comprised of multiple pleadings. By having

arbitrarily and capriciously rejected that proposed third amended complaint, Judge Schofield and

Judge Gorenstein did so in violation of FRCP Rule 15, the findings that are shown next that are

from _Dresner v. Tallahassee_, 375 U.S. 136, 84 S. Ct. 235, 11 L. Ed. 2d 208 (1963) and _Whalen_

_v. County of Fulton_, 126 F.3d 400 (2d Cir. 1997) that partly concern obstruction of justice,

findings in _In re Fitch, Inc._, 330 F.3d 104 (2d Cir. 2003) that address abuse of discretion by

judges, findings in _Wynder v. McMahon_, 360 F.3d 73 (2d Cir. 2004) that confirm that judges are

prohibited from adding restrictions that exceed those established by FRCP Rule 8 about the form

in which complaints and amended complaints may be prepared and submitted in federal court

litigation, and findings in _Phillips v. Girdich_, 408 F.3d 124 (2d Cir. 2005) that confirm that

judges are to not exalt the form of pleadings that partly include complaints and amended

complaints over their substance.

- **Excerpt from _Dresner v. Tallahassee_**:

  "It is fundamental that our constitutions accord to the citizen of the United States the right of
  freedom of speech and of assembly and to peaceably petition for a redress of grievances.
  Such freedoms are jealously guarded and when exercised in good faith and in good order
  may not be lawfully interfered with by governmental action."

- **Excerpt from _Whalen v. County of Fulton_**:

"The constitutional right of access is violated where government officials obstruct legitimate efforts to seek judicial redress. *See Barrett v. United States,* 798 F.2d 565, 575 (2d Cir.1986) ("[T]he Constitution protects causes of action from arbitrary interference" by government officials.); *see, e.g., Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984) (police conspiracy to cover up facts of victim's fatal shooting violated right of access). "[W]hen government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively," an unconstitutional deprivation of a cause of action occurs. *Barrett,* 798 F.2d at 575."

When Mr. Redmond illegally seized me in the subway station that is near New York City Hall on 7/25/17, he flagrantly violated my First Amendment and Fourteenth Amendment right to "communicate directly to government officials" partly to petition for redress with respect to the Mayor and other government officials who were then present in that subway station that the following excerpt from *Kittay v. Giuliani*, 112 F. Supp.2d 342 (S.D.N.Y. 2000) explicitly confirms I have:

"The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. *See McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); *Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992)"

Mr. Redmond's illegal seizure of me in that subway station on 7/25/17 was strictly retaliation against me for criticism and whistleblowing that I loudly engaged in as I stood near the Mayor on the uptown subway platform in that subway station while I was physically separated from where the Mayor was by the metal vertical partition that I discussed earlier and Mr. Fowler. I needed to loudly project my voice towards the people who were on the downtown subway platform to have my views clearly heard because I wasn't using a microphone in contrast to the fact that the Mayor was then illegally doing so. Back then, the Mayor was running for re-election and using that illegal publicity stunt to attract attention that would collaterally improve his prospects for being re-elected. Others and I had a clear legal right to try to lawfully undermine

his efforts to be heard during that event by diverting attention away from him towards me. I wasn't the only member of the public who was criticizing the Mayor during that event, but I was the only person to be illegally seized by members of the NYPD during it in flagrant violation of my constitutional rights in regards to selective-enforcement, equal protection, and due process. Mr. Redmond's illegal seizure of me in that subway station on 7/25/17 also occurred just one week after I talked with the Mayor on 7/18/17 during the public resource fair meeting that he conducted in Queens and told him that Mr. Redmond illegally prevented me from attending his 4/27/17 town hall meeting. My conversation with the Mayor then occurred directly in front of whistleblower news censors in journalism that partly included Michael Gartland (he now works for the New York Daily News and then worked for the New York Post), Gloria Pazmino (she now works for Spectrum News and may have then worked for Politico New York), and Jillian Jorgensen (she then worked for the New York Daily News and now works for Spectrum News). The next screenshot is from the video recording that the Mayor's Office arranged to be recorded of the Mayor's 7/18/17 public resource fair meeting in Kew Gardens in Queens and shows me as I told the Mayor that Mr. Redmond illegally prevented me from attending the public town hall meeting that the Mayor conducted on 4/27/17 with Mr. Banks, and others.



The preceding screenshot is from the elapsed time of 1 minute and 53 seconds in a relatively

short video clip that is available on the Internet at https://drive.google.com/file/d/1-

ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc/view?usp=sharing that I recorded from the video

recording that the Mayor's Office arranged to be recorded of the Mayor's 7/18/17 public

resource fair meeting that it provided to me strictly in response to a FOIL demand that I

submitted to it for that entire video recording. The Mayor's Office illegally concealed that video

recording that is a public record from the public largely to engage in voter suppression and voter

fraud while violating the Hatch Act (5 U.S.C. §1502(a)(1)), New York City Charter §1116, New

York State's Open Meetings Law, New York City Charter §2604 (b)(3), and other applicable

laws. Concerning this point, New York City Charter §2604 (b)(3) states the following:

> "3. No public servant shall use or attempt to use his or her position as a public servant to
> obtain any financial gain, contract, license, privilege or other private or personal advantage,
> direct or indirect, for the public servant or any person or firm associated with the public
> servant."

The following are relevant excerpts from _Piesco v. City of New York, Dept. of Personnel_ that

underscore what I just pointed out above about voter suppression by the Mayor's Office by

concealing that video recording from the public:

    a.    "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

    b.    The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

    c.    Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

    d.    "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, _the manner in which government is operated or should be operated_, and all such matters relating to political processes."

    e.    A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

    f.    "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

    g.    "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

    h.    Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

With respect to the plain text of both New York City Charter §2604 (b)(3) and 5 U.S.C.

§1502(a)(1), stealing the 2017 New York City government elections by illegally preventing

whistleblowers and legal adversaries like me from attending public town hall meetings, public

resource fair meetings, and public hearings in the rooms in which they were conducted by members of the public in a collaborative manner partly with the Mayor, Mr. Banks, members of the City Council, members of the NYPD, journalists, and others as they were recorded on video partly by the Mayor's Office that was broadcast over the Internet to countless others to preserve their job security and gain access to career advancement opportunities certainly are illegal acts by public servants that involve using and attempting to use their positions as public servants to obtain and preserve financial gains, privileges, and other private and personal advantages - directly and indirectly – for themselves and other people (such as the Mayor, Mr. Banks, New York State Senator Jessica Ramos, Mr. Redmond, and Ritchie Torres) who were associated with them. After temporarily providing me access to the video recording that the Mayor's Office arranged to be recorded of the Mayor's 7/18/17 public resource fair meeting, the Mayor's Office illegally disabled my access to that video recording or removed that video recording from the Internet. As I talked with the Mayor during that 7/18/17 public resource fair meeting, I also told the Mayor then that Mr. Redmond was a defendant in a civil rights lawsuit as I was then referring to *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(KNF) (S.D.N.Y. Jun. 13, 2018). Mr. Banks is the bald man who stood between the Mayor and I in that screenshot as Mr. Banks wore a red tie and eyeglasses. I had ongoing, multifaceted, and entirely valid litigation against HRA continuously between July of 2016 and the present. I commenced all of that litigation and engaged in protected activity by doing so as the scope of that litigation widened considerably as a result of an order to show cause application that I filed on 5/19/17 in *Komatsu v. New York Human Resources Administration*, No. 100054/2017 (Sup. Ct., New York Cty.) that is hereinafter referred to as "my HRA lawsuit" in which I began the process of asserting claims against Mr. Redmond and others in response to the illegal acts and omissions that were

committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall meeting.

Additionally though this case in which I seek to intervene is largely about the Black Lives Matter

movement, the bald Black male who appears in the preceding screenshot confirmed by his illegal

acts against me on 7/18/17 and 3/18/19 that not all Black lives matter. The next screenshot from

the elapsed time of 2 minutes and 7 seconds in my video clip from that 7/18/17 video confirms

that this as he illegally put his right hand on a backpack that I wore as he illegally pushed me

away from the Mayor without any legal justification as I voluntarily leaving the Mayor's

company after he illegally refused to intervene on my behalf about what I just told him very

clearly about Mr. Redmond's civil rights crimes against me at a public forum that benefited the

Mayor and his administration.



What appears in the preceding screenshot in that video followed what appears in the next

screenshot from that video as that Black male and the Mayor illegally made physical contact

with me and otherwise tried to do so as I deliberately leaned away from the Mayor to avoid being

touched by what I regard as filthy trash (Bill de Blasio) to get a huge head start on the social-distancing practice that is so commonplace now.



This screenshot clearly shows that my arms were crossed and my hands were against my chest in a harmless way as that Black male with his right hand illegally on my backpack as the Mayor tried to touch me near my right shoulder. New York State Senator Jessica Ramos is the person that I regard as total garbage who appears in the lower-right corner in this screenshot as she then worked for the Mayor's Office and sent e-mail messages about me at the end of June in 2017 to a whistleblower news censor in journalism named Erin Durkin (she then worked for the New York Daily News and now works for Politico New York) in which she made remarks that were defamatory against me and confirmed that she was personally involved in illegally covering-up and condoning illegal acts and omissions against me partly by New York City government personnel that caused me to be illegally prevented from attending public town hall meetings and public resource fair meetings on 4/27/17, 5/23/17, and 6/8/17 in the rooms in which they were conducted partly by the Mayor and Mr. Banks.

On 2/15/19, I received copies of e-mail messages about me that Ms. Ramos and others sent that were sent by people that partly included Mr. Redmond, other members of the NYPD, Jaclyn Rothenberg of the Mayor's Office, other government personnel, and Ms. Durkin in response to a FOIL demand that I submitted to the Mayor's office. I thereafter promptly apprised Judge Schofield in K1 on 2/19/19 and 3/5/19 about some of those e-mail messages that were sent between Ms. Ramos and Ms. Durkin as well as others that included one that was sent by Mr. Redmond about me because the sum and substance of what was discussed in those e-mails clearly supported my claims in K1 and suggested that there were additional entirely valid claims and defendants that I could add in K1 that related back to, clarified, and amplified what were then my existing claims in it. However, Judge Schofield fraudulently omitted any discussion about those e-mails in her orders and decisions in K1 as a criminal accomplice of the City of New York while engaging in flagrant obstruction of justice. I also apprised Judge Gorenstein about those e-mails prior to 5/1/19 primarily because I sought for him and Judge Schofield to issue an order that would compel the City of New York to immediately provide me unredacted copies of the e-mails that I received on 2/15/19 from the Mayor's Office that included some that had redactions applied to them. Whereas Judge Schofield totally ignored my requests in K1 to have her issue an order to compel the City of New York to provide me unredacted copies of those e-mails, Judge Gorenstein arbitrarily and capriciously denied a request on 5/2/19 (Dkt. 170) that I later submitted directly to him on 4/26/19 (Dkt. 168) for that relief.

Ms. Ramos' remarks about me in the e-mail message that appears in the next screenshot that she sent on 6/28/17 at 3:27 pm to Ms. Durkin and Eric Phillips while Mr. Phillips was the Mayor's mouthpiece explicitly confirm that she was condoning the fact that my ability to lawfully attend

public town hall meetings that were partly conducted by the Mayor in accordance with my First

Amendment and Fourteenth Amendment rights, New York State's Open Meetings Law, and

relevant controlling findings in a large number of court decisions was being illegally,

preemptively, discriminatorily blocked as a naked abuse of process and First Amendment

retaliation for having commenced my HRA lawsuit. Contrary to Judge Schofield's lies in her

9/30/19 decision in K1, video recordings and other sources of information about how those town

hall meetings were conducted clearly confirm that they were conducted mostly as traditional or

designated public forums instead of limited public forums.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.

Jessica

In this e-mail message that corresponds to the preceding screenshot, Ms. Ramos lied by claiming

that I hadn't RSVP'd to a town hall meeting. Contrary to her lie, I RSVP'd to every single town

hall meeting resource fair meeting that the Mayor partly conducted. I also have never illegally

threatened Mr. Banks. Criticism, whistleblowing, and sarcasm against Mr. Banks and HRA that I

have engaged in as well as litigation against Mr. Banks and HRA that I have commenced is

protected First Amendment activity. _Hartman v. Moore_, 547 U.S. 250, 126 S. Ct. 1695, 164 L.

Ed. 2d 441 (2006) includes the following pertinent findings that confirm that government

personnel are prohibited from retaliating against people in response to protected activities that

they engage in:

> "Official reprisal for protected speech "offends the Constitution [because] it threatens to
> inhibit exercise of the protected right," _Crawford-El_ v. _Britton_, 523 U. S. 574, 588, n. 10
> (1998), and the law is settled that as a general matter the First Amendment prohibits
> government officials from subjecting an individual to retaliatory actions, including criminal
> prosecutions, for speaking out, _id.,_ at 592; see also _Perry_ v. _Sindermann,_ 408 U. S. 593, 597
> (1972) (noting that the government may not punish a person or deprive him of a benefit on
> the basis of his "constitutionally protected speech"). Some official actions adverse to such a
> speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory
> grounds are in fact insufficient to provoke the adverse consequences, we have held that
> retaliation is subject to recovery as the but-for cause of official action offending the
> Constitution. See _Crawford-El, supra,_ at 593; _Mt. Healthy City Bd. of Ed._ v. _Doyle,_ 429 U. S.
> 274, 283-284 (1977)"

Furthermore, contrary to additional lies that Ms. Ramos expressed about me in that e-mail

message that she sent to Ms. Durkin on 6/28/17 at 3:27 pm, I never illegally threatened any

member of the NYPD that her remarks in that e-mail concern. The fact that I never illegally

threatened anyone while I was at the site of the Mayor's 4/27/17 largely explains why the City of

New York illegally didn't' preserve the video recording that was recorded between 5:30 pm and

6:30 pm by the video security camera that was controlled by DOE at the entrance to the school

that hosted the Mayor's 4/27/17 town hall. I also have an entirely credible eyewitness who can

vouch for the fact that I didn't make illegal threats on 4/27/17 while I was at the site of that town hall meeting and in his company between 5:45 pm and 7:45 pm. I submitted a sworn affidavit of that eyewitness in K1 on 12/14/18 (Dkt. 65) that Judge Schofield illegally ignored instead of properly and heavily factoring it into her 9/30/19 decision in that case. Ms. Ramos also confirmed in her e-mail to Ms. Durkin that Mr. Redmond illegally made physical contact with me on 4/27/17 as he was the person to whom she referred as she indicated that someone touched my arm while talking with me. Monday morning quarterbacking with respect to hindsight confirms that I should have immediately broken Mr. Redmond's hand on 4/27/17 in self-defense in response to him having illegally and deliberately made physical contact with my arm with it as he was then illegally preventing me from attending the Mayor's 4/27/17 town hall and lying about why he was doing so. If I had done exactly that at the same time that witnesses were nearby who likely saw him illegally initiate physical contact with me while he was also recorded on video doing so, it is far less likely that he would have again illegally made physical contact with me on 7/25/17 and 8/30/17. However, he illegally did so again on both of those dates. When he did so on 8/30/17, he did so while I was lawfully attending the public town hall meeting in Brooklyn that was partly conducted by the Mayor as I engaged in whistleblowing against Mr. Redmond by sarcastically asking him how his case of _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(KNF) (S.D.N.Y. Jun. 13, 2018) was going as I sat in a chair next to other members of the public. That prompted him to immediately approach me instead of continuing to walk past me as he illegally made physical contact with me that I immediately and lawfully objected to in a very vocal manner as I ordered him to get away from me and pointed out to him that he had no legal right to make physical contact with me. He thereafter illegally retaliated against me by causing me to be illegally ejected from that town hall meeting.

The next screenshot shows more e-mail messages that Jessica Ramos and Ms. Durkin sent to one another on 6/28/17 about me.

On Jun 28, 2017, at 6:01 PM, Ramos, Jessica
<JRamos@cityhall.nyc.gov> wrote:

On the former, there was only disruptive behavior.

Working on latter.

Sent from my BlackBerry 10 smartphone.

**From:** Erin Durkin
**Sent:** Wednesday, June 28, 2017 17:51
**To:** Ramos, Jessica
**Cc:** Phillips, Eric
**Subject:** Re: town halls

Thanks. What was the threat against Banks?

Also, on the RSVP issue - he has now provided emails he sent
RSVP'ing for the LIC and Rego Park town hall. He also sent an
RSVP confirmation from the Bronx Resource Fair (believe I
said Bronx town hall before but it was actually the resource
fair he was barred from). Want to double check on this?

Ms. Ramos implicitly and very clearly confirmed in her e-mail to Ms. Durkin on 6/28/17 at 6:01 pm that she lied to her about me by claiming that I had threatened Mr. Banks. However, she yet again lied in that new e-mail by fraudulently claiming that I engaged in disruptive behavior as she committed further defamation against me. I hadn't engaged in disruptive behavior either. This sufficiently proves that when U.S. District Judge Edgardo Ramos described Ms. Ramos as a "young lady" on 12/15/20 during the telephone conference that I had with him in the consolidated case of _Komatsu v. City of New York_, No. 18-cv-7046 (ER)(GWG)(S.D.N.Y.) that

is hereinafter referred to as "K2", his description of her confirmed that he was entirely ignorant about the fact that her remarks about me to Ms. Durkin in June of 2017 prove that she is a fucking bitch, criminal, and ugly hag with respect to her looks and lack of character instead of a "young lady" who materially helped to steal the outcome of the 2017 New York City government elections. That theft thereafter proximately led to the set of events that caused this case to be commenced by virtue of the fact that Bill de Blasio has been the illegitimate and bastard New York City Mayor since 1/1/18 on account of the fact that the outcomes of the 217 New York City government elections were stolen by members of his administration and NYPD security detail in 2017 for his benefit, the benefit of those who stole them, and other government personnel. While Bill de Blasio continued to be the bastard Mayor on and following 1/1/18, he and other bastard New York City government personnel that partly include people who were members of the City Council on and after 1/1/18 continued to be obsequious servants of the NYPD's criminal mob whose gangsters decided to drive an SUV into people during the 2020 demonstrations in New York City instead of properly executing a "K-turn" with that vehicle, taking a detour, and driving it throughout One Police Plaza in Manhattan, through the NYPD's 48th precinct, and over federal court security officer ("CSO") Ralph Morales and his criminal accomplices to befit the public's interest in crime prevention, public safety, and accountability.

Furthermore, Ms. Durkin's remarks in the e-mail that she sent to Ms. Ramos and Eric Phillips on 6/28/17 at 5:51 pm confirm that Ms. Durkin caught Ms. Ramos lying to her by fraudulently claiming that I hadn't registered in advance to attend public town hall meetings and public resource fair meetings that were partly conducted by the Mayor. I shared that information via e-mail to another whistleblower news censor in journalism named Graham Rayman while he then worked for the New York Daily News. He still works for that whistleblower news censorship

company that may soon be acquired by another firm that will hopefully fire its personnel and liquidate it in a way that is similar to the storyline in the movie "Wall Street". Additionally, the e-mails that I received from the Mayor's Office on 2/15/19 in response to my FOIL demand confirm that Ms. Ramos, Jacklyn Rothenberg, and other personnel of the City of New York illegally had access to information about my HRA lawsuit that was sealed continuously between January of 2017 and October of 2018 as a result of New York State Supreme Court Judge Barry Ostrager having granted a sealing request on 1/17/17 that I submitted in my HRA lawsuit. The excerpt from the e-mail message shown next that a senior assistant for Mr. Banks named Raquel Lucas sent on 4/10/17 at 5:24 pm to Mr. Banks, Ms. Rothenberg, and several other New York City government personnel flagrantly violated my privacy rights in regards to litigation that I was engaged in against HRA that she was prohibited by law from disclosing information about to people she that e-mail message on account of the fact that they didn't work for HRA. She sent that e-mail message just one day before I was scheduled to both **a)** attend the public resource fair meeting that the Mayor and Mr. Banks conducted in Staten Island, **b)** participate in a hearing remotely in litigation that was parallel to claims that I asserted in my HRA lawsuit that I was then scheduled to have an oral arguments hearing in as well on 4/12/17 before I learned on 4/11/17 that an attorney for HRA and New York State Supreme Court Judge Nancy Bannon illegally stole that 4/12/17 oral arguments hearing from me in violation of my First Amendment and Fourteenth Amendment rights while Ms. Bannon was running for re-election as a judge by acting in concert for that purpose in response to an illegal ex-parte adjournment application that was faxed to Judge Bannon's chambers on 4/5/17 by that HRA attorney (Jeffrey Mosczyc). By doing so, Ms. Bannon and Mr. Mr. Mosczyc criminally engaged in obstruction of justice and witness tampering as Ms. Bannon illegally adjourned my 4/12/17 oral arguments hearing to

6/7/17 in violation of my right to contest that adjournment before it could legally be issued. The redactions in this screenshot reflect those that were applied by the Mayor's Office before it provided me that e-mail.

| | |
|---|---|
| **From:** | Lucas, Raquel |
| **To:** | Lauter, Rachel; Carrion, Marco A.; Arslanian, Kayla; Rothenberg, Jaclyn |
| **Cc:** | Banks, Steven (HRA); Yeaw, Jennifer |
| **Subject:** | Staten Island Resource Fair 4/11 Re: Towaki Komatsu |
| **Date:** | Monday, April 10, 2017 5:24:02 PM |
| **Attachments:** | image001.png |

Good Afternoon,

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████
████████████████████

See below for his case history:

Here is where things get really interesting. The next screenshot is from the first page of the memorandum of law that a deceitful attorney for the New York State Attorney General's Office named Monica Hanna filed on 1/11/19 in K1 (Dkt. 81) on Letitia James' behalf before Ms. James commenced this case mainly to engage in grandstanding after she lost badly in a lawsuit that she commenced against Exxon at the New York State Supreme Court in Manhattan as New York State court officers illegally didn't enforce a ban against demonstrations within 200 feet of that courthouse during that trial as they engaged in illegal selective-enforcement for Ms. James' benefit to allow people to demonstrate directly in front of the steps to that courthouse against Exxon as I took photographs and/or recorded video of that.

**MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS
ANTHONY MANZI, MATTHEW BRUNNER, AND RAMON DOMINGUEZ'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

LETITIA JAMES
Attorney General
State Of New York

*Attorney for State Defendants*

28 Liberty Street
New York, New York 10005
Tel.: (212) 416-8227

The next screenshot is from page 2 of that memorandum and confirms that Ms. Hannah lied

about all of her claims that Judge Schofield thereafter fraudulently affirmed by ignoring

applicable video recording evidence, an eyewitness account in a sworn affidavit that I filed in

K1, and controlling law as she illegally didn't give me an opportunity to engage in proper

discovery prior to her issuing her 3/1/19 and 9/30/19 decisions in K1 in flagrant violation of

applicable findings in *DaCosta v. City of New York*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) NS

*Cramer v. Devon Group, Inc.*, 774 F. Supp. 176 (S.D.N.Y. 1991) about judges prematurely and

prejudicially allowing summary judgment motions to be considered before a proper discovery

has taken place in a case.

## II.   PLAINTIFF FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

### A.   Plaintiff Does Not Adequately Allege the State Defendants' Participation In the Deprivation of Any Constitutional Right

### B.   The State Defendants Did Not Illegally Prevent Plaintiff From Engaging in Protected Speech Inside the Courthouse

### C.   Plaintiff Had No Constitutionally Protected Right to Attend the Public Resource Fair in the Courthouse

### D.   State Defendant Captain Manzi Did Not Interfere with Plaintiff's Possessory Interest In Any Property

The next screenshot is from a magnified playback of the video recording that the New York State Office of Court Administration ("OCA") provided to me in response to a FOIL demand that I submitted to it that was recorded by a video security camera that it controls that was installed on 5/23/17 inside of the Bronx Supreme Court on its first floor above the entrance to Room 105. The first part of that video recording that has relevant video footage is available on the Internet at https://drive.google.com/open?id=1Mdj55D4XnCDanRdVwM56DFhv5zS2R94l and was recorded between 8:59 am and 10:58 am on 5/23/17. The screenshot that appears next corresponds to the elapsed time of 29 minutes and 11 seconds in that video that was at 9:49:11.157 am while my HRA lawsuit was still sealed and just 4 days after I filed an order to show cause application in it that I thereafter brought with me to the Bronx Supreme Court on 5/23/17 while it was in the large white bag of mine that is shown in this screenshot and while that was just one day after New York State Supreme Court Judge Nancy Bannon issued an order on 5/22/17 about that application that I also had with me on 5/23/17 in that courthouse to discuss both of them with Mr. Banks, the Mayor, journalists, and others while lawfully attending the

Mayor's 5/23/17 public resource fair meeting and engaging in protected whistleblowing activity while doing so against the Mayor's administration, HRA, NYPD, and HRA's business partners.



The next screenshot shows the preceding screenshot without the playback of that video being magnified. New York State Court Officer Captain Anthony Manzi (badge #: 182) is the fat man who is shown in the following screenshot as he illegally seized the large white bag of mine that contained legal filings from my HRA lawsuit while it was sealed. New York State Court Officer

Sergeant Matthew Brunner (badge #: 478) is the bald man who also wore a white shirt as he had his left hand near his head as he stood to the left of Mr. Manzi in this screenshot. New York State Court Officer Sergeant Ramon Dominguez (badge #: 508) is the man who also wore a white shirt as he stood behind Mr. Manzi and to the right of Mr. Brunner in this screenshot. An unknown female member of the NYPD who was assigned to its Community Affairs Unit is shown on the right side in this screenshot near the middle as she wore a blue shirt. An additional unknown male New York State court officer who wore a black uniform is shown near the top and toward the right in this screenshot. Jeff Lynch appears in the upper-left area in this screenshot while he had a thick beard and worked for the Mayor's CAU as a first deputy commissioner. His LinkedIn profile that reflects his career is available on the Internet at https://www.linkedin.com/in/jeff-lynch-4890a112a/.



There is no possible way whatsoever that any unbiased judge can plausibly claim that what appears in the preceding two screenshots does not clearly show flagrant violations of my Fourth Amendment rights as a result of Mr. Manzi's illegal seizure of my property as he seized that to try to lure me away from where I was lawfully assembled in accordance with my First Amendment and Fourteenth Amendment rights while he, Mr. Brunner, Mr. Dominguez, NYPD Detective Gerola, NYPD Lieutenant Nieves, NYPD Detective Andrew Berkowitz of the Mayor's NYPD security detail as well, and Rachel Atcheson of the Mayor's CAU were illegally acting in concert to illegally prevent me from attending the Mayor's 5/23/17 public resource fair meeting that was then being conducted inside of the Veterans' Memorial Hall chamber in that courthouse during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran. Prior to arriving at that courthouse on 5/23/17, I registered with the Mayor's Office in advance to attend that 5/23/17 public resource fair meeting and received a confirmation message in response that indicated that my registration had been accepted and that my attendance at that meeting was expected.

The next 3 screenshots are from a short video recording that is available on the Internet at https://drive.google.com/open?id=18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB that I recorded with my cell phone on 5/23/17 at 9:40 am of NYPD Lieutenant Nieves, NYPD Detective Gerola, NYPD Detective Berkowitz, Mr. Brunner, and Mr. Dominguez as they met near where I was and Room 105 in that courthouse. It's objectively reasonable to infer that what the totality of the fact and circumstances were then that the purpose of their meeting was to continue to collaborate and act in concert to illegally cause me to continue to be prevented from attending the Mayor's 5/23/17 public resource fair meeting in violation of my constitutional rights and other laws.

Mr. Nieves, Mr. Berkowitz, Mr. Dominguez, Mr. Gerola, and Mr. Brunner appear from left to right in this screenshot.



Mr. Dominguez, Nieves, Mr. Berkowitz, Mr. Gerola, and Mr. Brunner appear from left to right in this screenshot.



Nieves, Mr. Gerola, and Mr. Brunner appear from left to right in this screenshot.



On 8/28/20, Shawn Kerby of OCA who works for it as an assistant deputy counsel and FOIL

representative sent me an e-mail message that I received at 9:32 am in which she provided me a

copy of an official report that is known as an "Unusual Occurrence Report" that New York State

Court Officer completed on 5/24/17 about the interactions that he, Mr. Brunner, Mr. Dominguez, Mr. Gerola, Mr. Nieves, and Ms. Atcheson had with me on 5/23/17 inside of the Bronx Supreme Court as I lawfully sought to attend the Mayor's 5/23/17 public resource fair meeting in accordance with my constitutional rights and otherwise lawfully assemble in other public areas in that courthouse on its first floor. The report number for that report is 75089 and the date and time of the incident that report concerns is listed in it as having taken place at 9:50 am on 5/23/17.  I have made a copy of that report available as a PDF file on the Internet at

https://drive.google.com/file/d/17tMgW-PYuI5EVZ4DL33snrtNTTqkFjbD/view?usp=sharing.

Mr. Manzi prepared that report in conjunction with Mr. Brunner, and Mr. Dominguez as they served as witnesses for the information that report contained. The "DETAILS" SECTION in that report states the following about me that confirms that referred to the fact that **a)** Ms. Atcheson was among members of the Mayor's staff who illegally prevented me from attending the Mayor's 5/23/17 public resource fair meeting and that **b)** Mr. Nieves, Mr. Gerola, and Mr. Berkowitz were also personally involved in illegally preventing me from attending that public resource fair meeting.

> "AT ABOVE T/P/O, THE ABOVE **UNKNOWN SUBJECT WAS DENIED ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL**. SUBJECT WAS ASKED TO VACATE THE AREA HE WAS STANDING IN BECAUSE HE WAS BLOCKING PEDESTRIAN TRAFFIC TO BOTH THE EVENT IN THE ROTUNDA AND ACCESS TO THE PUBLIC ELEVATORS. AFTER SOME RESISTANCE TO THIS REQUEST, SUBJECT DID COMPLY BUT MOVED INTO A MAGNETOMETER PROCESSING AREA. SUBJECT WAS ASKED TO MOVE FROM THIS AREA, AND ONCE AGAIN COMPLIED AFTER SOME INITIAL RESISTANCE."

(boldface formatting added for emphasis)

Mr. Manzi lied in that report by claiming that I was blocking pedestrian traffic in that courthouse and that I was standing in a magnetometer processing area. Neither of those claims by him were

true. He also fraudulently and illegally omitted the material fact that he illegally seized my large white bag in that courthouse after I completed the security screening process to enter that courthouse and that he, Mr. Brunner, and Mr. Dominguez were also personally involved in illegally preventing me from **a)** attending the Mayor's 5/23/17 public resource fair meeting and **b)** lawfully assembling near the entrance to Veterans Memorial Hall in that courthouse that was in a public corridor near elevators. Everything that I just discussed about Mr. Manzi, Mr. Brunner, and Mr. Dominguez confirm that they violated my constitutional rights on 5/23/17 inside of that courthouse as they also violated their Fourteenth Amendment affirmative legal duty as law-enforcement personnel to intervene on my behalf against others who were illegally preventing me from attending the Mayor's 5/23/17 public resource fair meeting. Concerning what I just discussed, Alan C. Marin issued a decision on 12/9/10 on behalf of the New York State Court of Claims while he was then a judge who was assigned to it. He is now assigned to the New York State Supreme Court in Manhattan. That court decision is available on the Internet at http://vertumnus.courts.state.ny.us/claims/html/2010-016-069.html. I'm not sure about how to properly present the legal citation for that court decision. That court decision includes the following key finding that repudiates Judge Schofield's findings in her 9/30/19 order that caused my 5/23/17 claims against Rachel Atcheson of the Mayor's' CAU and Mr. Manzi, Mr. Brunner, Mr. Dominguez, Mr. Nieves, Mr. Gerola, and Mr. Berkowitz to be dismissed:

> "the detaining of an individual may be pretextual to remove him or her from a public meeting, speech or demonstration."

The following excerpt from _Casey v. State_, 148 A.D.3d 1370, 51 N.Y.S.3d 203 (App. Div. 2017) reinforces this point about the fact that Judge demonstrated prejudice and bias against me to fraudulently dismiss my claims about 5/23/17 in K1 largely because it confirms that the New York State court officers who illegally acted in concert with members of the NYPD and Ms.

Atcheson to illegally prevent me from attending the Mayor's 5/23/17 public resource fair

meeting and otherwise illegally didn't make an effort to intervene on my behalf to enable me to

attend that and further intervene on my behalf in response to Mr. Manzi illegally seizing my

property in that courthouse that included a sealed legal filing in my HRA lawsuit were

authorized to disregard unlawful orders that they may have been issued to violate my

constitutional rights in that courthouse on 5/23/17 through their acts and omissions:

> "Moreover, the rules that require an officer to comply promptly with lawful orders do not
> unequivocally forbid all resistance to every order; they further provide that **the officer "shall
> not obey any order which is inconsistent with the law**," must request clarification or
> confer with a supervisor when in doubt as to whether an order is lawful, and must obey an
> order that he or she believes to be unlawful only if the supervisor fails to modify the order
> after being respectfully informed of the subordinate's belief that it is unlawful (Court Officers
> Rules and Procedures Manual § 1.30 [B], [C])."

> (boldface formatting added for emphasis)

On a related note, the decision that U.S. District Judge Denise Cote issued in _Picard v. Clark,_

_No. 19 Civ. 3059 (DLC) (S.D.N.Y. Aug. 14, 2020)_ sufficiently confirms that Judge Schofield

arbitrarily, capriciously, prematurely, and prejudicially refused to allow me to add senior

members of OCA that partly include Michael Magliano, Lawrence Marks, and Janet DiFiore as

defendants in K1 through her 3/1/19 order.  Picard v. Clark was partly commenced against Mr.

Magliano and was about an incident that involved a courthouse in the Bronx that is located near

the Bronx Supreme Court. Judge Cote issued her decisions in that cause after having engaging in

comprehensive fact-finding and analysis. Judge Schofield's 3/1/19 order wasn't even half-baked

by comparison as she instead fraudulently relied exclusively on self-serving claims that were

made by Monica Hanna who represented Mr. Manzi, Mr. Brunner, and Ms. Mr. Dominguez in

K1 as the New York State defendants in that case.  Judge Schofield outrageously and

prejudicially stayed discovery in K1 on 5/16/19 (Dkt. 197) instead of allowing me to be provided

with a copy of the New York State Court Officers Rules and Procedures Manual that is cited in

*Casey v. State* and the Unusual Occurrence Report that Mr. Manzi completed on 5/24/17 about

me before she issued her 9/30/19 decision in K1. I didn't' know learn about *Casey v. State* that

referred to the New York State Court Officers Rules and Procedures Manual and *Goonewardena*

*v. Spinelli,* No. 15-CV-5239 (MKB)(ST) (E.D.N.Y. Mar. 5, 2020) that mentions Ms. Hanna and

Unusual Occurrence reports in them that New York State court officers complete until 2020.

This means that I didn't have sufficient information through no fault of my own to submit a

request for documents to Ms. Hanna prior to 5/16/19 while she involved in K1 to have her

provide me a copy of the New York State Court Officers Rules and Procedures Manual and the

Unusual Occurrence Report that Mr. Manzi completed on 5/24/17 about me. The fact that Judge

Schofield has never conducted a conference with me in K1 has also proven to have prejudiced

my ability to obtain various types of relevant information. One of the reasons for this is because I

learned about local civil rule 83.10 on 1/11/21 that is applicable to certain cases against the City

of New York that are commenced pursuant to 42 U.S.C. §1983 just in the Southern District by

attorneys that are restricted to cases that include allegations the use of excessive force, false

arrest, or malicious prosecution by members of the NYPD. In short, local civil rule 83.10 that is

available as a PDF file on the Internet at

https://www.nysd.uscourts.gov/sites/default/files/pdf/Local-Civil-Rule-83.10.Final.pdf is

impermissibly discriminatory against pro se litigants because pro se litigants can't benefit from

it. One of the things that local civil rule 83.10 offers is the ability for limited discovery to be

completed within 28 days after the first defendant in a case files its answer that would cause the

plaintiff to be provided various discovery material.

The next screenshot is from page 3 of the order that Judge Gorenstein issued on 9/14/18 in K1 that confirms that hindsight confirms he arbitrarily and capriciously refused to try to cause me to be assigned pro-bono counsel in K1 as he lied by fraudulently claiming that he would seek the appointment of such counsel for me in that case without needing me to resubmit a request for that.

nature that would warrant seeking volunteer counsel. The Court will seek the appointment of counsel without further request by plaintiff if future review of this matter demonstrates that the appointment of counsel is warranted.

Finally, plaintiff's request to bring electronic devices into the Courthouse is denied.

SO ORDERED.

Dated: September 14, 2018
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

The next 2 screenshots are from an order that Judge Gorenstein issued on 10/31/19 in K1 in which he implicitly confirmed that he lied in his 9/14/18 as he acknowledged in his 10/31/19 order that he only granted my application for him to issue an order to try to cause me to be appointed pro-bono legal counsel in K1 after I had to renew an application that I previously made in K1 for that purpose that he explicitly stated in his 9/14/18 order I wouldn't need to do in order for me to thereafter issue such an order.

GABRIEL W. GORENSTEIN, United States Magistrate Judge

The pro se plaintiff in this matter today renewed an application he previously made (Docket # 39) for the Court to request the appointment of counsel. The application was previously denied (Docket # 51). The Court now finds that the factors set forth in Cooper v. A. Sargenti Co., 877 F.2d 170 (2d Cir. 1989), counsel in favor of granting plaintiff's application for

Accordingly, the Court requests that the Pro Se Intake Unit make efforts to secure counsel for plaintiff. However, the Court notes that it is not guaranteed that private counsel will be found for this case. Thus, any deadlines set in this case are unaffected by this Order.

SO ORDERED.

Dated: October 31, 2019
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

I have no reason to believe that any good-faith efforts were made on or after 10/31/19 by the Pro Se Intake Unit to try to secure counsel for me in K1. Also, Judge Gorenstein's 10/31/19 order didn't indicate that there would be a limited number of attempts that the Pro Se Intake Unit would need to make for that purpose prior to giving up. No lawyer nor law firm has ever contacted me to arrange an intake session to determine whether sufficient grounds existed for that attorney or law firm to possibly provide me legal counsel for K1 as a result of actions that have been taken by the Pro Se Intake Unit. In hindsight, I believe that Judge Gorenstein fraudulently denied my original request for his assistance with trying to cause me to be assigned pro-bono counsel in K1 partly to prevent me from being eligible and entitled to benefit from local civil rule 83.10 to make it as difficult as possible for me to prevail in K1 on the merits. Hindsight confirms that throughout K1, I have fought lawfully and relentlessly tooth-and-nail at

every turn through my submissions against Judge Gorenstein and Judge Schofield in response to arbitrary, capricious, fraudulent, prejudicial, biased, and pretextual orders, decisions, and memo endorsements that they have issued. This explains why I have submitted so many submissions in that case instead of being able to properly maintain a laser-focus against the opposing counsel and defendants in that case that seem to keep Judge Gorenstein and Judge Schofield on a leash.

Although you may believe that it's not appropriate and relevant for me to include a discussion about Judge Gorenstein in this application to intervene in this case, that certainly isn't true largely because he is garbage in my view that this case and K1 has in common because he is assigned to both of them and will have the ability to equally sabotage matters in this case in favor of the defendants as he has in favor of the defendants in K1. In fact, though FRCP Rule 72 confirms that I'm entitled to object to discovery orders that Judge Gorenstein issued in K1 by having Judge Schofield review those objections and issue a determination about them before I would need to comply with discovery orders that Judge Gorenstein issued in that case, he made it perfectly clear that he was hell-bent on flagrantly violating my Fourteenth Amendment equal protection and due process rights as well as my First Amendment rights to receive Judge Schofield's 1/13/21 order in K1 that I didn't receive until after 1/15/21 by demanding that I comply with his arbitrary, capricious, prejudicial, and biased 12/18/20 discovery order in K1 prior to receiving Judge Schofield's 1/13/21 order that was in response to my objections to his 12/18/20 order. On 1/12/21, Judge Gorenstein issued a memo endorsement in K1 (Dkt. 466) in which he arbitrarily and capriciously refused to stay his 12/18/20 order to the extent that it imposed a deadline of 1/15/21 for me to complete discovery matters by He issued that 1/12/21 memo endorsement while he was aware that Judge Schofield hadn't yet responded to my

objections to his 12/18/21 order as he lied in his memo endorsement by fraudulently claiming

that my earlier application for him to stay that 1/15/21 deadline and otherwise extend it didn't

meet a standard for him to grant my request to stay that deadline or extend it.

Contrary to his deceit, when U.S. Magistrate Judge Sarah Netburn issued her 11/24/20 decision

in *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-01570 (GBD)(SN) (S.D.N.Y.

Nov. 24, 2020), she made it perfectly clear that the reason why she extended a deadline in that

case to complete a discovery matter to a date that would be more than one month after U.S.

District Judge George Daniels issued a related order on 11/16/20 was because Judge Daniels'

11/16/20 order was in response to objections pursuant to FRCP Rule 72 that the plaintiffs in that

case filed and she stayed the deadline for completing a discovery matter that she issued in her

7/22/19 order pending the outcome of Judge Daniels' 11/16/20 order. The clear legal precedent

that Judge Netburn established by staying her discovery deadline in that case pending Judge

Daniels' 11/16/20 order was something that I certainly had a Fourteenth Amendment due process

and equal protection right to benefit from in K1 in regards to Judge Gorenstein's 12/18/20 order

and Judge Schofield's 1/13/21 order in response to my objections about his 12/18/20 order.

Despite this fact, Judge Gorenstein proved as recently as yesterday that he is totally out of

control in K1. One of the ways that he proved that he is out of control and needs to be severely

sanctioned immediately partly by being belatedly fired from K1 was by issuing the order that

corresponds to docket number 485 in K1 yesterday in which he authorized the defendants'

attorneys to submit an application for him to sanction me for not complying with his illegal

1/15/21 discovery deadline that was effectively rendered null and void by **a)** the fact that I didn't

receive Judge Schofield's 1/13/21 order in K1 until after 1/15/21 and **b)** the applicable precedent

that was set in *In Re Terrorist Attacks on September 11, 2001*. The next screenshot is from page

2 of Judge Gorenstein's order yesterday that corresponds to docket number 485 in K1 in which

he fraudulently concealed the material and overarching fact that he arbitrarily and capriciously

refused to stay his 1/15/21 deadline in K1. I have since filed a notice of interlocutory appeal in

K1 pursuant to the collateral order doctrine partly to vacate Judge Gorenstein's order that

corresponds to docket number 485.

occurred.") (footnote omitted).  No court ever issued such a stay and a request for a stay does not
act as a stay.  If plaintiff has failed to comply with Docket # 450 (or any other court order),
defendants have leave to apply for an appropriate sanction.

     The defendants are directed to email a copy of this Order to plaintiff.

Dated: January 29, 2021
     New York, New York

SO ORDERED.

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Furthermore, while clearly proving that attorneys for the New York City Law Department are

lazy and very stupid, one of its attorneys who is named Evan Gottstein submitted a letter

yesterday in K2 as one of the defendants' attorneys. The next screenshot is from page 1 in that

letter that shows that he stupidly listed the wrong caption for K1 in that letter. Oops.

Re: <u>Natanya Aberra v. City of New York, et al.</u>
20-CV-7046; 20-CV-8251; 20-CV-8004; 20-CV-7502; 20-CV-8540;
20-CV-8933; 20-CV-9151; 20-CV-9154; 20-CV-9354 (ER)

Your Honor:

I am the Assistant Corporation Counsel in the Office of James E. Johnson, Corporation Counsel of the City of New York (the "City"), assigned to the defense of the above-referenced matter. I write to respectfully request a 10-day enlargement of time, from January 29, 2021, until February 8, 2021, to file defendants' Motion to Dismiss. This is City defendants' first request for an enlargement of time to file this motion.[1] Plaintiff has not responded to City defendants' attempt to obtain his consent to this request; however, defendants submit that this request will not prejudice plaintiff.

Given the holiday period, defendants' commitments in other matters, mandatory unpaid furlough days due to the citywide fiscal crisis, defendants' obligations to respond to plaintiff's requests for a preliminary injunction and leave to amend in recent weeks, and severe remote internet outages this week, City defendants require this brief enlargement to file their motion to dismiss the nine complaints involved in this consolidated action.

More importantly, Mr. Gottstein used that letter to ask U.S. District Judge Edgardo Ramos to grant him an extension of a deadline as he asserted totally unsubstantiated claims in it in which he alleged that he experienced a severe Internet outage. Concerning that point, though I submitted a similar request in K1 to Judge Gorenstein to be granted an extension of his 1/15/21 deadline in that case largely because I lacked Internet access, Judge Gorenstein stated the following about that on 1/5/21 in the memo endorsement (Dkt. 460) that he issued in K1 as he arbitrarily and capriciously denied my request for an extension:

"To the extent he seeks a new deadline tied to a date relating to his access to internet service, the application is denied."

I will not comply with any unlawful order that I'm issued. Refusing to comply with an unlawful order was one of the primary things that I was trained about while I served in the U.S. Navy. and took an oath to defend the U.S. Constitution against all enemies indefinitely and without any exception prior to learning that Judge Gorenstein is among its enemies. Furthermore, Judge Gorenstein also issued another order in K1 yesterday to illegally waste my time and harass me

that corresponds to docket number 487.  The following shows the text of first paragraph in that

order:

> In Docket # 479, plaintiff refers to having "recorded" a telephone conversation with opposing
> counsel about a discovery matter. No reference is made to plaintiff having obtained counsel's
> written permission. If permission was not obtained, any such recording violates the Court's
> Order of December 18, 2019, which stated that "neither side may make an audio recording of
> any telephone conference between the parties without all participants' written permission."
> (Docket # 294) If written permission was obtained, plaintiff shall file a letter on or before
> February 12, 2021 so stating. If it was not obtained, plaintiff is ordered to show cause, by
> means of a filing made on or before February 12, 2021, why he should not be sanctioned for
> this conduct pursuant to the inherent powers of the Court and/or Fed. R. Civ. P. 16(f)(1)(c),
> through the preclusion of discovery or other sanctions.

In New York State, when people have telephone conversations in which both parties are inside of

New York State during those phone calls, consent isn't needed by both of those parties in order

for one of them to make audio recordings of such phone calls. Furthermore, the First

Amendment prohibits government personnel from imposing unlawful prior restraints on First

Amendment freedoms. Among other things, the First Amendment includes the right to receive

information. Judge Gorenstein illegally imposed a prior restraint on my First Amendment rights

through his 12/18/19 order in K1 by requiring me to obtain consent from the attorneys for the

defendants in that case to exercise my legal right to record audio recordings of our telephone

calls during which all of us would be in New York State. By imposing that illegal restriction on

my legal right to make electronic recordings of telephone calls, Judge Gorenstein flagrantly

violated the findings in _Whalen v. County of Fulton_, 126 F.3d 400 (2d Cir. 1997) that I discussed

earlier in this letter by engaging in obstruction of justice while using a fraudulent pretext in doing

so. The specific reason that Judge Gorenstein gave and used as a patently fraudulent pretext in

his 12/18/19 order in K1 for imposing that illegal restriction on my legal right to make electronic

recording of telephone calls was to "not inhibit the free flow of communication" during

telephone conferences that I would have with the attorneys in K1. Judge Gorenstein needed an objectively valid legal justification to have imposed that illegal restriction on my First Amendment rights and never had one. To reinforce this point further, _Higginbotham v. City of New York_, 105 F. Supp. 3d 369 (S.D.N.Y. 2015) includes the following relevant findings that confirms that people have a First Amendment right to receive information from all available sources:

> "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." _First Nat'l Bank of Boston v. Bellotti_, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); _see also Houchins v. KQED, Inc._, 438 U.S. 1, 11, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (stating that "[t]here is an undoubted right to gather news `from any source by means within the law'"

Also, the following relevant excerpt about viewpoint discrimination that is from _Police Dept. of Chicago v. Mosley_, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972) applies:

> "But, above all else, **the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content**. _Cohen_ v. _California,_ 403 U. S. 15, 24 (1971); _Street_ v. _New York,_ 394 U. S. 576 (1969); _New York Times Co._ v. _Sullivan,_ 376 U. S. 254, 269-270 (1964), and cases cited; _NAACP v. Button,_ 371 U. S. 415, 445 (1963); _Wood_ v. _Georgia,_ 370 U. S. 375, 388-389 (1962); _Terminiello_ v. _Chicago,_ 337 U. S. 1, 4 (1949); _De Jonge_ v. _Oregon_ 299 U. S. 353, 365 (1937). **To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship**. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." _New York Times Co._ v. _Sullivan, supra,_ at 270."

> (boldface formatting added for emphasis)

Moreover, the following excerpt from _Crago v. Leonard_, No. 2:13-cv-531-TLN-EFB PS (E.D. Cal. Aug. 5, 2014) includes related findings about the First Amendment right to make electronic recordings of government personnel as long as that doesn't interfere with how those government personnel perform their official duties:

"If a plaintiff has a clearly established constitutional right to record from a public place where the plaintiff has the lawful right to be, a plaintiff surely has such a right in his or her home. There simply is no principled bases upon which to find that although the right to record officers conducting their official duties only extends to duties performed in public, the right does not extend to those performed in a private residence."

In addition, my desire to record my telephone conversations with attorneys for the defendants in K1 is supported by the public's countervailing and overriding interest in transparency and government accountability as well as the sum and substance of what was reported about the New York City Law Department in a New York Times article that Alan Feuer wrote that is entitled "The Lawyers Protecting the N.Y.P.D. Play Hardball. Judges are Calling Them Out." that was published on the Internet on 9/12/18 at the following address:

https://www.nytimes.com/2018/09/12/nyregion/nypd-lawyers.html

In short, that article reported that the New York City Law Department often engages in illegal gamesmanship in litigation. On a related note, Judge Gorenstein proved in _Brown v. City of New York_, No. 15-cv-4091 (PKC)(GWG)(S.D.N.Y.) that he is a dutiful, subservient, and vile cat's paw of the City of New York, NYPD, and the New York City Law Department. On 2/26/19, the New York Daily News published a news article that had a misleading headline of "Judge Slams City Lawyers, NYPD for Misleading Info on Bronx Man Who Died of Asthma Attack While in Police Custody" about a baseless decision that Judge Gorenstein issued in that case. That article was written by Stephen Rex Brown and is available on the Internet at

https://www.nydailynews.com/new-york/ny-metro-barrington-williams-evidence-20190213-story.html. Although that article reported that attorneys for the New York City Law Department failed to produce evidence when they were required to produce it in a lawsuit, that article indicated that Judge Gorenstein claimed that delay and inaction was negligent instead of willful. However, there is no objectively valid reason to believe that it was not willful. Attorneys for the

plaintiff in _Brown v. City of New York_ submitted a letter on 4/18/19 (Dkt. 217) to Judge

Gorenstein in which they discussed the fact that the NYPD illegally didn't produce critical

evidence for more than 3 years that it was required to produce for that case. Such a failure to

produce critical evidence for that length of time is a clear sign of willfulness instead of

negligence. The following is a screenshot from page 1 of that letter.

Honorable Gabriel W. Gorenstein
Chief United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:    _Karen Brown v. City of New York_, No. 15-cv-4091 (PKC) (GWG)

Your Honor,

      We write as Plaintiff's counsel to request a Local Civil Rule 37.2 conference concerning Defendant City's failure to comply with the Court's March 29, 2019 Order. The Court's Order required the City to produce an affidavit explaining why the NYPD failed to produce critical evidence for more than three years of this litigation as the Court will need this information to determine appropriate sanctions for the City's substantial discovery violations. While the City produced four declarations that touch on the issues the Court ordered the City to explain, the declarations do not explain what steps the NYPD undertook to locate and collect relevant evidence. The declarations only state that the City's Law Department requested two specific files from the NYPD and the NYPD only produced one of those files. There is no explanation why the NYPD did not produce the second file, nor what steps it took to locate and collect the _three_ investigation files that have recently surfaced from the Transit Bureau Investigation Unit ("TBIU"), Crime Scene Unit, and 44th Precinct Detective Squad. Nor do the declarations explain what steps were taken to preserve the recording of the radio transmissions or Det. Fernandez's notes after Plaintiff's Notice of Claim was served on the City's Law Department. Plaintiff respectfully requests that the Court order the City to disclose all efforts by the NYPD to collect evidence to explain how the three NYPD investigation files were not disclosed for more than three years, and all efforts by the City – which includes the NYPD, the Comptroller's Office, and the Law Department – to preserve the audio recording and Detective Fernandez's notes.[1]

      On March 29, 2019, following the revelation that the City had failed to timely produce the three NYPD investigation files that contained important previously-undisclosed evidence, the

Furthermore, by imposing an illegal restriction on my legal right to make electronic recordings

of my telephone conversations with the attorneys for the defendants in K1, Judge Gorenstein

illegally interfered with my legal right to be able to use those recordings while possibly meeting

with attorneys who would possibly consider providing me legal representation in K1 in order to

help them to determine whether there was sufficient grounds for them to provide me legal

representation that I have sorely needed in K1 largely to combat flagrant, repeated, substantial,

and ongoing acts of judicial misconduct by both Judge Gorenstein and Judge Schofield that

demand the immediate reassignment of K1 to other judges and quite possibly a change of venue.

Judge Gorenstein's illegal restriction on my legal right to make electronic recordings of my

telephone conversations with the attorneys for the defendants in K1 also served to illegally

prevent me from gathering material evidence with which to destroy fraudulent claims that Judge

Gorenstein made in his 1/15/21 order (Dkt. 473) in K1 in which he fraudulently claimed that I

hadn't complied with paragraph 2.A of his Individual Practices that is available as a PDF file on

the Internet at https://www.nysd.uscourts.gov/sites/default/files/practice_documents/GWG

Individual practices -- GWG -- %28January 29 2020 version%29_0.pdf to have him compel the

City of New York to provide me discovery material that I long sought in K1 as early as 2/19/19

and first apprised him about on 4/26/19 that he arbitrarily and capriciously first denied on 5/2/19

before he again arbitrarily, capriciously, and fraudulently denied me that relief on 1/15/21.

Another entirely valid and obvious reason to make electronic recordings of telephone calls is to

preserve information about what was discussed in them in the best possible way largely to make

certain that no possibility exists that someone who took part in those phone calls will be

misquoted. In this respect, it's analogous to why journalists record audio recordings of press

conferences to ensure accurate reporting.

Returning to my earlier discussion about Judge Schofield's illegal bias and prejudice against me

in K1, in issuing the findings that she issued in her 3/1/19 and 9/30/19 decisions in K1, Judge

Schofield defied the controlling legal standard that is discussed in _Scott v. Harris_, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) that is applicable largely to disregarding what clearly appears in video recording evidence:

> "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

Judge Schofield also violated her legal duty pursuant to from _Triestman v. Federal Bureau of Prisons_, 470 F.3d 471 (2d Cir. 2006) to accord me special solicitude because of my status as a pro se litigant partly by **a)** construing and interpreting my submissions in K1 to raise the strongest arguments that they suggested and **b)** recognizing and accepting implied claims that I asserted in K1 that partly included the First Amendment right to assemble, petition for redress, have access to the courts, engage in expressive association, access public forums, communicate directly to government officials, communicate information to others in public forums, and receive information in public forums while enjoying equal protection and due process while attempting to do so. The sum and substance of Judge Schofield's findings in her 3/1/19 and 9/30/19 decisions in K1 confirm this is true. This means that she violated my Fourteenth Amendment equal protection and due process rights as they pertain to the fact that the following excerpt from _Bomani v. Baraka_, Civ. No. 20-655 (KM)(ESK) (D.N.Y. Dec. 30, 2020) confirms that the judge in that case recognized and accepted the Plaintiff's First Amendment "right to speak" claim that was an implied claim:

> "The complaint does not explicitly identify a cause of action. I construe the complaint as asserting a First Amendment "right to speak" claim under 42 U.S.C. § 1983, and state law tort claims of assault or negligence."

Judge Schofield also impermissibly, fraudulently, biasedly, and prejudicially ignored relevant findings in _Henry v. Wyeth Pharmaceuticals, Inc._, 616 F.3d 134 (2d Cir. 2010) that concern how

agents and proxies can be used by supervisors and other senior personnel as pawns through which to commit illegal acts that violate constitutional rights in her 9/30/19 decision in K1 that repudiated findings that she issued in that decision to my detriment. On 5/23/17, NYPD Detective Gerola illegally positioned his body directly in front of the entrance to the Veterans' Memorial Hall chamber in the Bronx Supreme Court as I lawfully walked toward it to attend the Mayor's 5/23/17 public resource fair. He did so to deliberately try to block me from attending that public forum. The draft e-mail message that is shown in the next screenshot corresponds to the fact that I created that draft at 9:33 am on 5/23/17 to record a simple note about the fact that he did so then. In hindsight, I should have immediately shoved him out of my way and engaged in legal self-defense against him and anyone else if they made physical contact with in response to doing so.

| | | |
|---|---|---|
| Towaki Komatsu <towaki_komatsu@yahoo.com> (No Subject) | ▢ Drafts - Yahoo! | May 23, 2017 at 9:33 AM |
| Gerola 6577 | | |

This case is also about surveillance by the NYPD against peaceful demonstrators in 2020 that arguably violated the Handschu Agreement. The next screenshot is from the video recording that OCA provided to me that I discussed earlier and shows Mr. Lynch spying on a conversation that I was having with Michael Gartland on 5/23/17 on the first floor of the Bronx Supreme Court as I was then engaging in whistleblowing against the Mayor's administration and NYPD. I discussed Mr. Gartland earlier in this letter. This screenshot corresponds to the elapsed time of 18 minutes and 18 seconds in that video and the time of 9:38:18.164 on 5/23/17. I'm shown on the right with my head turned towards Mr. Gartland who is shown as he then wore a press

credential over his chest and wore eyeglasses. While issuing her 9/30/19 decision in K1, Judge

Schofield fraudulently concealed Mr. Gartland's name and HRA's identity as the news reporter

that I talked with inside of the Bronx Supreme Court on 5/23/17 and the New York City

government agency that my HRA lawsuit was against. This leads me to believe that Judge

Schofield was bribed to do so and wonder if her whoever bought her was given a sales receipt for

their purchase of total garbage.



The next screenshot is from that same video and shows Mr. Nieves violating the Handschu

Agreement as he illegally spied on a conversation that I was having with Mr. Gartland. This

screenshot corresponds to the elapsed time of 17 minutes and 31seconds in that video and the

time of 9:37:31.790 on 5/23/17.  This screenshot clearly shows Mr. Nieves' head while he

sharply turned it to his left to spy on Mr. Gartland and I.



In the event that Jumaane Willliams may choose to request to intervene in this case in connection with his status as New York City's Public Advocate, I urge you to deny that application. I told him and New York City Councilman Brad Lander on 5/23/17 during a meeting that they conducted in lower Manhattan near 200 West Street that I was illegally prevented from attending the Mayor's 5/23/17 public resource fair meeting before neither of them did anything on my behalf. For identical reasons, I request for you to let me offer feedback in response to any other applications that may be submitted by or on behalf of government officials for permission to intervene or appear as an interested party in this case.

The New York City Law Department provided me a video recording that was recorded of Mr. Redmond on 9/17/12 and the 5/19/17 deposition transcript that jointly confirm that he committed perjury during that deposition about the material fact about why he ordered Kalan Sherrard to be stopped and detained by other members of the NYPD near him on 9/17/12 in front of the

Manhattan Family Court while Mr. Sherrard was riding a bicycle. That courthouse is located

close to where Mr. Sandoval illegally put one of his hands on me on 5/29/20. In short, Mr.

Redmond claimed in that deposition that he ordered Mr. Sherrard to be stopped by members of

the NYPD on 9/17/12 because Mr. Sherrard was blocking a car that he was driving. However,

the video recording that the New York City Law Department provided to me shows that Mr.

Redmond was driving a car in the middle of a roadway and separated from where Mr. Sherrard

was riding a bicycle along the far-left side of that roadway by the lengths of more than 2 cars at

Mr. Redmond wasn't trying to turn in the direction of where Mr. Sherrard was riding his bicycle.

The next screenshot is from page 20 in the sworn deposition that Mr. Redmond gave on 5/19/17

in connection with *Sherrard v. City of New York*. The information in that screenshot shows

questions that Mr. Redmond was asked and how he answered them between lines 11 and 17.

```
11        Q     The question is, why did you stop at
12   that location?
13        A     Because I was blocked by
14   bicyclists.
15        Q     And was Mr. Sherrard any of those
16   bicyclists that were blocking you?
17        A     Yes.
```

The next screenshot is from the elapsed time of 10 seconds in the video recording that was

recorded on 9/17/12 of Mr. Redmond, Mr. Sherrard, Oleg Chernyavsky of the NYPD, and others

in front of the Manhattan Family Court that the New York City Law Department provided to me.

Both the deposition transcript and video recording were provided to me in response to a FOIL

demand that I submitted to the New York City Law Department. That video recording is

available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye.



The following facts are true about what is shown in the preceding screenshot:

a.  Kalan Sherrard is the bicyclist who was then riding a bicycle while he was located in front of all of the other bicyclists as he was shown on the far-left side in that screenshot.

b.  Mr. Redmond is driving a black car while holding its steering wheel with just his right hand. By doing so, Mr. Redmond impermissibly imperiled the safety of bicyclists on that road and others nearby in the event that he would have needed to brake suddenly in response to a driver, pedestrian, animal, or bicyclist suddenly getting in front of his car in order to brace for a collision while exercising control over his car's movements.

c.  Contrary to Mr. Redmond's lies in the 5/19/17 deposition transcript on page 20, Mr. Sherrard was not blocking Mr. Redmond's car whatsoever. Instead, Mr. Sherrard was separated from the front of Mr. Redmond's car by more than the lengths of two cars that appear on the right side of that road and was located on the far-left side of that roadway as Mr. Redmond's car was located in the middle of that roadway.

The next two screenshots correspond to what appears in that video at the elapsed time of 52 seconds. The first screenshot shows Oleg Chernyavsky of the NYPD's Legal department on the far left as he talked with Mr. Redmond while Mr. Sherrard is shown in the upper-right corner while he wasn't wearing a shirt as that didn't violate any law. Both Mr. Chernyavsky and Mr. Redmond have received promotions within the NYPD since then instead of having been properly fired on 9/17/12 for violating Mr. Sherrard's constitutional rights that included Mr. Chernyavsky having failed to intervene on Mr. Sherrard's behalf in response to Mr. Redmond having illegally ordered members of the NYPD to cause him to be stopped while he was lawfully conducting himself while riding a bicycle adjacent to an area that was closed off because of construction work as shown by orange netting around that area.



The next screenshot shows Mr. Sherrard on the left and the orange netting to which I just referred that caused the sidewalk that ran alongside that road to be closed. The closure of that sidewalk meant that if pedestrians wanted to be able to somewhat safely walk on that side of the roadway, they would need to walk in the bicycle lane that NYPD scooters shown in this screenshot drove through while no bicycles nor vehicles were in that bicycle lane. This means that Mr. Sherrard's decision to not ride in that bicycle lane on 9/17/12 actually was courteous

with respect to pedestrians and a sensible precaution to avoid debris in that bicycle lane that may

have been in it partly because of the construction work that was taking place nearby. The tires on

Mr. Sherrard's bicycle certainly were far more susceptible to being punctured than the tires on

the NYPD scooters that drove through that bicycle lane because the tires on Mr. Sherrard's

bicycle were much thinner.



Concerning the outcome of *Sherrard v. City of New York*, the primary reason why Mr. Sherrard

didn't prevail in that case against Mr. Redmond was because attorneys for Mr. Redmond used a

smokescreen tactic to divert the jury's attention from pertinent facts and that jury was far too

stupid to pay attention to what I just discussed. In fact, a news reporter and I both overheard that

stupid jury laughing during its deliberations in that case while we lawfully stood in a public area

outside of the jury room. This point is confirmed by the following excerpt from a news article

that Stephen Rex Brown wrote, the New York Daily News published on 6/13/18, is entitled

"Street Performer Who Said He Was Unfairly Arrested Loses Lawsuit Against Mayor De

Blasio's Head Of Security", and is available on the Internet at http://www.nydailynews.com/new-

york/ny-metro-kalan-sherrard-occupy-zucotti-trial-arrest-20180613-story.html:

"After only an hour of deliberations, the eight-person jury found that the city was not liable for violating Sherrard's Fourth Amendment rights against unlawful search and seizure. Panelists laughed loudly inside the jury room."

Mr. Redmond's interactions with Mr. Sherrard on 9/17/12 that resulted in Mr. Sherrard having been illegally detained by the NYPD for roughly 19 hours occurred on the same date that Mr. Redmond was personally involved in the arrest of a journalist named Christopher Faraone by Zuccotti Park in lower Manhattan. As a result of Mr. Redmond's involvement with Mr. Faraone then, Mr. Faraone filed a lawsuit against Mr. Redmond that corresponds to the case of *Faraone v. City of New York*, No. 13-cv-9074 (DLC) (S.D.N.Y.) that ended with a legal settlement being issued to Mr. Faraone in which he received a grossly inadequate payment in the amount of $20,000. The New York City Comptroller's office provided me a copy of that settlement agreement in response to a FOIL demand that I submitted to it. Following Mr. Redmond's interactions with Mr. Sherrard and Mr. Faraone on 9/17/12, hindsight confirms that he wasn't satisfied with violating the civil rights of New Yorkers. As a result, he engaged in recidivism again in July of 2016 in Newark Airport to feed his apparent addiction to that. When he did so then, he violated the First Amendment rights of a journalist named Nathan Tempey as Mr. Tempey lawfully tried to take photographs of the Mayor in a public area in that airport. Concerning this point, a news article written by a journalist named Emma Whitford that was entitled "De Blasio Kept Press in the Dark About Trip Abroad Until Hours Before Departure" was published on 7/6/17 on the Internet at

http://gothamist.com/2017/07/06/de_blasio_europe_surprise.php by a news organization named Gothamist. That news article reported about the fact that Mr. Redmond flagrantly and illegally interfered with Mr. Tempey's First Amendment rights in that airport in July of 2016 while Mr. Tempey tried to photograph the Mayor from a sufficient distance away in accordance with the

principle of "freedom of the press." That news article also reported about the fact that Mr. Redmond lied to Mr. Tempey while meeting him then by telling Mr. Tempey that Mr. Redmond was a Port Authority police officer and that the New York City Civilian Complaint Review Board ("CCRB") later wrongly condoned Mr. Redmond's lie to Mr. Tempey. After that article was published on 7/6/17, it appears to have been updated to include a screenshot from a Twitter posting that Mr. Tempey posted on the Internet on 7/17/17 about his interactions with Mr. Redmond in Newark Airport in July of 2016. Between 7/17/16 and 5/20/17, Mr. Tempey engaged in discussions with journalists named Matthew Chayes who works for Newday, Josh Dawsey who works for the Washington Post, and Jillian Jorgensen who works for Spectrum News about the interactions that Mr. Tempey had with Mr. Redmond in Newark Airport in July of 2016 as well as a complaint that he reported against Mr. Redmond to the CCRB thereafter about those interactions. Those discussions are available on the Internet at https://twitter.com/nathantempey/status/754855502908129282. In short, Mr. Tempey implicitly confirmed in those discussions that the CCRB functions as a cat's paw for the Mayor while an attorney named Maya Wiley was then the chairwoman of the CCRB. Ms. Wiley was also Bill de Blasio's legal counsel and now hopes to replace him as New York City's Mayor. Mr. Tempey implicitly confirmed in those discussions on Twitter that the CCRB functions as a cat's paw for the Mayor by indicating that the CCRB condoned the illegal acts that Mr. Redmond committed against him in Newark Airport in July of 2016 by not having taken any action against Mr. Redmond for that as the CCRB also informed him that Mr. Redmond is permitted to lie while performing security duties for the Mayor.

**<u>Reasons why I should be granted intervenor status in this case thanks to Letitia James</u>**:

The next screenshot is from a draft e-mail message that I saved at 8:35 pm on 10/26/17 after I

just briefly talked with Letitia James right after she arrived near the entrance to the school that

hosted the public town hall meeting in Brooklyn on that date that was conducted by members of

the public in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman

Brad Lander, and others that Mr. Redmond and others illegally prevented me from attending. I

used that draft e-mail mainly to record the approximate time when I talked with Ms. James on

that date about the fact that I was then being illegally prevented from attending that public forum

as she told me then that she would look into that before she walked into the school that hosted

that town hall meeting and hindsight confirms that she lied to my face on that date by claiming

that she would look into why I was being illegally being barred from attending that public forum.

| Towaki Komatsu <Towaki_Komatsu@yahoo.com> | 🗀 Drafts - Yahoo! | October 26, 2017 at 8:35 PM |
| --- | --- | --- |
| (No Subject) | | |

8:30 pm

Public advocate arrives

The next screenshot is from a photograph that I took at 9:45 pm on 10/26/17 of the screen of the

cell phone that Jerry Ioveno of the Mayor's NYPD security detail was using on 10/26/17 as he

let me take that photo after he used that cell phone to take a photo of Mr. Redmond and I as I

was continuing to be illegally prevented from attending the Mayor's 10/26/17 town hall and

forced to stand behind a metal barricade that was being used to prevent me from attending that

public forum in flagrant violation of my constitutional rights after I registered in advance with

the Mayor's Office to attend that public forum and conducted myself in a lawful manner at the

site of that town hall meeting before, while, and after I was illegally prevented from attending

that town hall meeting. How I used my middle finger then accurately conveys how I felt about

everyone who was illegally preventing me from attending that town hall meeting in violation of

my constitutional rights through their acts and omissions as Mr. Redmond expressed satisfaction

and pleasure in this photo about the fact that he was succeeding in violating my constitutional

rights and stealing the outcome of the 2017 New York City government elections by engaging in

voter suppression, voter fraud, and whistleblower retaliation at public forums for the Mayor's

benefit, his own, and the benefit of others who support the NYPD's criminal mob.



The next screenshot is from the elapsed time of 5 seconds in a video recording that is available

on the Internet at

https://drive.google.com/file/d/1rfCuUONgfNAJjDNlcUpm3ZBQJP5Q0XOn/view?usp=sharing

that I recorded on 3/18/18 at 2:51 pm as I stood in Foley Square in an area in front of the TM

courthouse near Letitia James as she was being interviewed as was waiting for a chance to talk

with her afterwards.



The next screenshot is from the elapsed time of 3 seconds in that same video and confirms that I

was then holding a copy of the order that U.S. District Judge Mark Barnett issued on 3/5/18 in

*Sherrard v. City of New York*, No. 15-cv-7318 (MAB)(KNF) (S.D.N.Y. March 5, 2018) to signal

that I intended to talk with Ms. James about civil rights abuse by Mr. Redmond.



Right after Ms. James finished her interview, I struck up a conversation with her as I began to record an audio recording of it that is available on the Internet at

https://drive.google.com/open?id=1KVLmVu_oBcl7CJT_YD6qOsZL3Vvi-h9R. My

conversation with her begins at the elapsed time of 7 seconds in that audio recording. The following is entirely true and accurate about what is heard in that audio recording during my conversation with Ms. James:

   a.   At the elapsed time of 9 seconds, I reminded her about the fact that she and I previously talked towards the end of October of 2017 at the site of where the Mayor conducted a public town hall meeting as I was being illegally prevented from attending it while she entered the building that hosted that town hall meeting. I further reminded her on 3/18/18 that she told me then that she would look into that. She told me on 3/18/18 in response that she didn't remember that.

   b.   At the elapsed time of 19 seconds, I told her that the head of the Mayor's NYPD security detail was defending a federal civil rights lawsuit as I was then referring to Mr. Redmond and *Sherrard v. City of New York*.

   c.   At the elapsed time of 25 seconds, I told her that Mr. Redmond was repeatedly violating civil rights and asked her if there was something that she could do about that. She is heard at the elapsed time of 30 seconds as she lied to me by claiming that she couldn't do anything about that as she stated that the Mayor had managed to disallow her from intervening in lawsuits due to a lack of standing. She omitted the fact that she could have otherwise still done something about that by conducting press conferences among other things and perhaps having the City Council to conduct a public hearing about that issue to draw attention to it and hold the Mayor's feet to the fire as well as the NYPD's in the process.

   d.   At the elapsed time of 40 seconds, she suggested that I should possibly resort to dealing with the CCRB about my complaints against Mr. Redmond. In response, I told her that I

had already done so and that the CCRB hadn't done anything about that.

e. At the elapsed time of 44 seconds, she lied to my face again by telling me that she would follow-up about my complaints against Mr. Redmond.


The next screenshot that is shown on the left is from the elapsed time of 38 seconds in a video recording that is available on the Internet at

https://drive.google.com/file/d/12d_ISpRFGIkQ_ljY64Meo7uDR2tAVgkS/view?usp=sharing

that I recorded on 5/21/18 at 12:51 pm as I stood in front of Ms. James in front of what was then her office building that is located at 1 Centre Street as she stonewalled me and essentially blew me off about the conversation that I had with her on 3/18/18. I recorded that video of her shortly after she parted ways with the useless New York City Councilman Corey Johnson to whom I testified in detail and at length on 12/14/17 against the NYPD's criminal mob as he sat next to the equally useless New York City Councilwoman Vanessa Gibson in the Committee Room in New York City Hall. As I talked with Ms. James then and there on 5/21/18, I reminded her that she told me on 3/18/18 that she would look into my complaints against Mr. Redmond. The screenshot that appears on the right shows how she blew me off on 5/21/18 about that while being a fake New York City Public Advocate that her predecessor and successor were and have otherwise proven to be.



The next screenshot is from the elapsed time of 1 second in a video recording that I recorded on

5/16/18 at 2:40 pm in Brooklyn that is available on the Internet at

https://drive.google.com/file/d/11EUVZV3S2HU_CI_LjWSU8KP5kGXiltaD/view?usp=sharing

while attending the event that Ms. James conducted as she announced that she was running to be

elected as New York State's Attorney General while I sought to undermine her aspirations by

using her track record of apathy, complacency, and grandstanding against her in a very public

way. As Ms. James left that event, I clumsily crafted a question for her to see if she would

answer it while expecting that she wouldn't as I tried to ask her if she would ask a military

veteran's question then and there. She ignored me and left as I sought to follow-up with he about

my previous conversations with her about Mr. Redmond. A man who was then her Chief of Staff

stood directly in front of me as I recorded that video. I forgot his name and he now works for the

New York State Attorney General's Office too.



Prior to commencing this case, Ms. James conducted public hearings remotely on 6/17/20 and

6/18/20 about the NYPD's terrorism in 2020 that I was illegally prevented from testifying in

after I registered in advance with the New York State Attorney General's Office to lawfully do

so. By being prevented from testifying in those hearings, that violated my First Amendment and

Fourteenth Amendment rights as well as my rights pursuant to _Kittay v. Giuliani_, 112 F. Supp.

2d 342 (S.D.N.Y. 2000) that I discussed earlier. By having been prevented from testifying in

those hearings, that also constituted standardless discretion, abuse of process, and discrimination

by those who were responsible for that. While Ms. James conducted her 6/18/20 public hearing

about the NYPD's terrorism in New York City in 2020, she flagrantly violated the restrictions

that were applicable to that limited public forum by instead talking about irrelevant matters that wasted time that should have otherwise been used to allow me to testify about relevant matters during those either that hearing or the hearing that she conducted on 6/17/20. For example, as she talked with a man named Jeffrey Ouriel on 6/18/20 during the public hearing that she conducted on that date, she talked with him about dogs that he and his wife were taking care of as foster parents for them that was entirely unrelated to the subject matter of that hearings. Concerning this point, the video recording of that public hearing on 6/18/20 is available on the Internet at https://vimeo.com/430764584/70a54323df. At the elapsed time of 3 hours, 55 minutes, and 5 seconds in that video, Mr. Ouriel is shown. As he testified in that hearing, dogs are shown in that video and he and Ms. James talked about how he and his wife were taking care of them. The next screenshot is from the elapsed time of 3 hours, 55 minutes in that video and shows Mr. Ouriel as he let dogs outside of his residence while another dog was shown in the lower-right corner.



Although I love dogs, I would have also enjoyed not having Ms. James and her team flagrantly violate my First Amendment and Fourteenth Amendment right to testify lawfully against the

NYPD, her, the Mayor, members of the City Council, and whistleblower news censors in journalism during that hearing in a way that would have all been relevant to that hearing's agenda.

Prior to submitting this application to intervene in this case, I have long known that Letitia James is utterly useless, phony, and grandstands quite often. Also, before she decided to commence this case, the Mayor was recorded as he blew a kiss to Ms. James at the elapsed time of 13 seconds in the video recording that the Mayor's Office arranged to be recorded on 3/15/17 of the public town hall meeting that I and other members of the public conducted with the Mayor, Mr. Banks, New York City Councilman Corey Johnson. That video recording is available on the Internet at https://www.youtube.com/watch?v=i5LjWB2d2vc. Ms. James appears in the lower-right corner of this screenshot.



The next screenshot shows Ms. James in that same video as she exhibited body language to reciprocate to the Mayor.



On page 18 in this letter, I talked about a male member of the NYPD whose last name is Spinella who I talked with on 5/29/20 and saw again later on that date. This discussion that follows contains further information about him and other members of the NYPD that certainly is relevant to this application to intervene in this case. On 5/29/20, I recorded a video recording at 3:23 pm with my cell phone that is available on the Internet at https://drive.google.com/file/d/1X-wROnj3lM57yHgtoBinIsyC0umnH4Ve/view?usp=sharing as I talked with members of the NYPD's criminal mob in front of its headquarters while a large group of people were peacefully demonstrating in accordance with their First Amendment and Fourteenth Amendment rights. The next screenshot is from the elapsed time of 2 minutes and 8 seconds in that video as I asked NYPD Officer Bernier (shield # 5051) about why the NYPD was then illegally engaging in selective-enforcement in violation of the Fourteenth Amendment by not enforcing a ban that then existed that prohibited mass gatherings of more than 10 people.



 Instead of acting as law-enforcement then, she and other law-enforcement impostors that are members of the NYPD and masquerade as law-enforcement personnel while wearing such costumes refused to enforce that ban then and there. While doing so, she rhetorically asked me if I wanted her and her colleagues in the NYPD to arrest everyone who was then demonstrating in that immediate area in violation of the ban on mass gatherings of people. It wasn't my desire for such arrests to occur. Instead, she totally missed my point that was about having laws consistently enforced instead of engaging in illegal selective-enforcement and discrimination in violation of the Fourteenth Amendment that caused the vagueness doctrine to apply. As I continued to talk with Ms. Bernier and record that video, she told me at the elapsed time of 2 minutes and 15 seconds in it that the Mayor had authorized the mass gathering of people that was then near us. When I then immediately asked her to prove that by telling me where an order was that authorized, she didn't disclose such information to me and walked away. That fact suggested that she was lying. When I next asked her after she walked a short distance away from me to provide me her name and NYPD shield number, she initially ignored me before a supervising NYPD officer immediately intervened on my behalf in response to hearing me clearly state that she was not letting me get that information from her. This explains why she then walked back to me and let me record that information in that video that corresponds to the following screenshot:



Since Ms. Bernier ignored my question about where I could find a copy of the order that the Mayor allegedly issued that authorized a mass gathering of people on that date in front of the NYPD's headquarters, I then immediately asked a male supervising NYPD Officer whose last name is Spinella at the elapsed time of 2 minutes and 32 seconds in that video about why the ban on mass gatherings of people was illegally not being enforced by the NYPD. He didn't answer my question and walked away instead. The next screenshot is from that point in that video. His NYPD shield that he then wore indicated that he was then a "Chief of Support Services".



Earlier in that video at the elapsed time of 1 minute and 8 seconds, I'm heard rhetorically asking

Mr. Spinella if he wanted to be a defendant in a lawsuit in the event that members of the NYPD

would violate the civil rights of demonstrators. I was then mostly referring to entirely valid

claims about supervisory liability and municipal liability that could be asserted against him in

such a lawsuit. In response, he told me to do whatever I needed to do about that. I asked him that

question as I presciently anticipated that the NYPD's terrorism against peaceful demonstrators in

New York City in public forums was about to escalate and explode largely because the NYPD

was illegally engaging in selective-enforcement and discrimination by not enforcing the ban on

mass gatherings of people in New York City. The next screenshot is from the elapsed time of 43

seconds as I engaged in protected First Amendment expression by showing Mr. Spinella exactly

what I thought about the fact that he and other members of the NYPD's criminal mob were

illegally engaging in selective-enforcement and discrimination by not consistently enforcing the

ban on mass gatherings in New York City as he walked in front of a phalanx of people near the

TM toward the NYPD's headquarters.



As he walked by me then, I was holding a copy of the decision that Judge Schofield issued on

9/30/19 in K1 that she issued mostly in my favor while also including entirely fraudulent,

prejudicial, and baseless findings to my detriment in it after she fraudulently and prejudicially

ignored material facts and eyewitness accounts in reaching that decision. I held that decision then

partly as a recruiting initiative to try to see if members of the public that were then demonstrating

against the NYPD and the Mayor would be interested in possibly joining me as co-plaintiffs in

K1. I also held that 9/30/19 decision then and there in a location that was very close to where a

photojournalist named Jefferson Siegel took numerous photographs of me in front of the

NYPD's headquarters for use in what I was told in an e-mail message that I received from a

whistleblower news censor in journalism named Graham Rayman would be a news article that he

was preparing that would be published by the New York Daily News. The following e-mail

message that Mr. Rayman sent to me on 6/30/17 at 11:50 am concerned the fact that he arranged

to have Mr. Siegel take photographs of me in front of the NYPD's headquarters for use in a news

article that Mr. Rayman claimed to me that he was preparing about the fact that I had repeatedly

been illegally prevented from attending public town hall meetings and public resource fair

meetings on 4/27/17, 5/23/17, and 6/8/17 that were conducted by members of the public in a

collaborative manner with the Mayor, Mr. Banks, members of the City Council, and other City

of New York and State of New York government personnel while the Mayor and other

government personnel were running for re-election and using those events as campaign events to

attract publicity and support from voters and potential voters:

> **From:** "Rayman, Graham" <grayman@nydailynews.com>
> **Subject:** RE: My RSVP for 5/23 Bronx Resource Fair!
> **Date:** June 30, 2017 at 11:50:13 AM EDT
> **To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
>
> We need to photograph you. what's your cell number again?
> Thanks
> Graham
> 212 210 2234

Prior to sending me that e-mail message, Mr. Rayman and I engaged in a lengthy discussion

primarily via e-mail about the sum and substance of the news article that he clearly claimed to

me on 6/30/17 that was preparing that would be published by the New York Daily News on

7/2/17. The threaded e-mail discussion that is shown next that I had with Mr. Rayman between

6/28/17 and 6/30/17 confirms what I just stated and offers clarity about what the sum and

substance of the news article that Mr. Rayman would have been about if he and others who then worked for the New York Daily News that include Erin Durkin hadn't unconscionably censored that article by killing it even after an eyewitness who then worked for the New York State Attorney General's Office independently corroborated information that I shared with Mr. Rayman about illegal acts and omissions that were committed against me and that eyewitness at a public forum that the Mayor conducted on 6/8/17. Since I promised not to reveal the identity of that eyewitness, I won't.

**From:** "Rayman, Graham" <grayman@nydailynews.com>
**Subject:** RE: My RSVP for 5/23 Bronx Resource Fair!
**Date:** June 30, 2017 at 11:08:04 AM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

Thanks. I'm writing this today for Sunday. Did you send me the Gerola video? Who was the member of the mayor's staff?

**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Friday, June 30, 2017 11:07 AM
**To:** Rayman, Graham
**Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!

I forgot to tell you that right after the NYPD, court officers, and a member of the Mayor's staff illegally kept me out of the 5/23 public meeting in the Bronx Supreme Court, I immediately told Councilmen Brad Lander and Jumaane Williams in-person around 1 pm on that date at a meeting by Goldman Sachs' office in lower Manhattan that it had just happened to me.

On Jun 28, 2017, at 6:16 PM, Rayman, Graham <grayman@nydailynews.com> wrote:

Ok thanks. Will continue working on it tomorrow.

Sent from my iPhone

On Jun 28, 2017, at 6:09 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

By the way, I've got a video of NYPD Officer Gerola telling me on 4/27 after 10 pm that it was the Mayor's staff that was responsible for having kept me out of that event. Unfortunately, my phone was pointed at the ground as I accidentally recorded that video. Also, I then talked with both Nic Gulotta and Harold Miller of his staff to try get an explanation about why I had been discriminated against by Redmond on 4/27. I met

Harold Miller on 4/11 in Staten Island's Borough Hall after Mr. Banks lied to me outside that building.

On Jun 28, 2017, at 5:41 PM, Rayman, Graham <grayman@nydailynews.com> wrote:

Was it the resource fair you were barred from, or the mayor's Bronx town hall? Those were two separate events.

On Wed, Jun 28, 2017 at 5:37 PM, Rayman, Graham <grayman@nydailynews.com> wrote:


**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Wednesday, June 28, 2017 5:35 PM
**To:** Rayman, Graham
**Subject:** My RSVP for 5/23 Bronx Resource Fair!



Begin forwarded message:
**From:** CommunityAffairs <communityaffairs@cityhall.nyc.gov>
**Date:** May 22, 2017 at 2:09:43 PM EDT
**Subject:** Reminder: Tomorrow is the Bronx Resource Fair!

A reminder that you are on the RSVP list for tomorrow's Bronx Resource Fair!
Top city commissioners and senior staff will be at The Bronx County Building Veteran's Memorial Hall at 851 Grand Concourse tomorrow from 9 AM to 1 PM.
We look forward to seeing you there!


As I stated above, an eyewitness of mine corroborated relevant facts for Mr. Rayman about the sum and substance of the news article that he claimed to me on 6/30/17 that he was preparing that the New York Daily News would publish on 7/2/17. What follows is a minimally edited version of the e-mail message that eyewitness sent to Mr. Rayman and I on 6/24/17 at 4:26 pm. The only edit to that e-mail message that I made was by omitting the sender's information from it to protect that eyewitness' privacy rights. Also, that eyewitness' remarks in that e-mail about litigation that had with "different city agencies" was an exaggeration because that litigation was limited to being against HRA. In addition, the remark about me in that e-mail about me being a

harasser was a fraudulent pretext and pertained to a remark that Shauna Stribula of the Mayor's

CAU made to that eyewitness. Furthermore, the remark about a guard in that e-mail message

concerned NYPD Detective Raymond Gerola of the Mayor's NYPD security detail.

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall
> meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>
>
> I would just like to add that I was allowed to write my question on a card, after which the
> guard told me they would allow me in to ask the question after they reviewed it and
> people emptied the room. As the room emptied, they did not let me in saying that the
> room was full even though we saw empty seats in the TV screens. When I asked a
> Mayor's staff member why they wouldn't let me in, she explained it was because I was
> associated with Towaki and he was a "harasser", but did not explain anything else to me.
> I think maybe she was referencing Towaki's litigation history with different city agencies,
> but I am not sure since I just met him that day. I also think maybe they did not let me in
> because they did not like my question which was about police accountability, but I'm not
> sure about that since I know someone else in the room was allowed to ask a question
> about broken windows policing. Also, please keep my name anonymous. Thanks.

The next screenshot is from the video recording that the City Council arranged to be recorded of

the public hearing that its Committee on Public Safety conducted on 12/14/17 in the Committee

Room in City Hall.



That video recording is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=iHTEDJq355gP. My testimony in that hearing

begins at the elapsed time of 3 hours, 29 minutes, and 43 seconds in that video. This screenshot

shows that Ms. Gibson was illegally using a cell phone near her right hand during that hearing in

violation of rules that the City Council established that prohibit that. It also shows documents

between Ms. Gibson's hands that I submitted for her and Mr. Johnson to review that included

screenshots from video recordings that were recorded on 5/23/17 while I was being illegally

prevented from attending the Mayor's 5/23/17 public resource fair meeting that substantiated my

claims about that. That video recording and the written transcript that the City Council arranged

to be prepared from that hearing both confirm that Mr. Johnson said the following to me at the

end of my testimony against the NYPD's criminal mob in his capacity as a dutiful and

subservient cat's paw of the NYPD's mob whose apathy and complacency is partly to blame for

the NYPD's terrorism against New Yorkers in 2020 that gave rise to this case:

"I don't agree with much of what you said, but you have the, of course, legal right to say it, and we didn't want to interrupt your testimony. You're able to say whatever you wanted, and I really appreciate you coming today."

The next screenshot is from that same video as I testified in that hearing while the majority of those who were then members of that committee boycotted my testimony in flagrant violation of my First Amendment and Fourteenth Amendment rights pursuant to _Kittay v. Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) to "communicate directly to government officials" to petition for redress. This screenshot confirms that I had copies of the same written materials next to me that I submitted during that hearing for Mr. Johnson and Ms. Gibson to review.



It's worthwhile to point out that I lawfully and justifiably went after Mr. Johnson and Ms. Gibson by lambasting them for having violated my due process and First Amendment rights as I testified in that hearing by having failed to have other members of the City Council grant me

reasonable accommodations for that public hearing by providing me a laptop and external TV screen from which I could present and otherwise project video recordings in conjunction with my testimony during that hearing for the benefit of the public to apprise it of illegal acts that members of the NYPD had committed against me and the greater public partly to steal the 2017 New York City government elections. As I criticized Mr. Johnson and Ms. Gibson about that, I told that that I ha d contacted the City Council prior to that hearing to have it make such arrangements for that hearing. I also told them that the fact that such arrangements weren't made for me violated my due process rights with respect to a U.S. Supreme Court decision that I informed them they had violated by not making such arrangements. I was referring to _Goldberg v. Kelly_, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) by that remark.  When you issued your 1/7/21 order (Dkt. 3) in _Komatsu v. City of New York_, No. 20-cv-10942 (MC)(S.D.N.Y. Jan. 7, 2021) that is hereinafter referred to as "K3", you unconscionably rubber-stamped the patently illegal order (Dkt. 62) that Judge Ramos issued on 1/5/21 in K2 without any jurisdiction and immunity to do so that he issued to cause my complaint in K2 to be struck. He issued that order after Judge Schofield issued a superseding order (Dkt. 352) on 5/13/20 in K1 in which she explicitly stated the following about me and my need to commence K3 and other litigation as new civil actions instead of adding the claims and defendants in them in K1:

"Plaintiff must file new civil actions without Court intervention."

K3 is a countersuit in response to the fact that I prevailed in the entirely frivolous, malicious, and retaliatory case of _People v. Komatsu_, No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) by virtue of its dismissal and sealing on 1/23/20 by Bronx Criminal Court Judge Tara Collins. In short, that case resulted from members of the NYPD's criminal mob having illegally stopped, seized, assaulted, injured, stalked, and harassed me on 12/26/17 while I was walking in a

traditional public forum that was a public passageway between a park and a school that wasn't any part of the property of either of them and was near where I reside just 12 days after I testified against the NYPD's criminal mob on 12/14/20 during the public hearing that Mr. Johnson and Ms. Gibson conducted that I discussed above. In response to complaints that I reported to the useless CCRB against NYPD Officer Saquoi Harris, (badge #: 2350) and NYPD Officer Steven Perez (badge #: 23485) for illegally stopping, seizing, assaulting, injuring, harassing, seizing, and arresting me on 12/26/17, the CCRB fraudulently claimed that I engaged in trespassing on 12/26/17 in spite of the fact that the NYPD's criminal mob voided the baseless trespassing charge and a simple inspection of the area where my feet were on 12/26/17 in that passageway confirms that I wasn't in the nearby nor on school property. Instead, that passageway connects 2 sections of Fairmount Place. The NYPD Internal Affairs Bureau ("IAB") also fraudulently claimed that I engaged in trespassing on 12/26/17 in that area. Neither the CCRB nor the IAB bothered to pay attention to the material fact that either **a)** Mr. Harris illegally either didn't turn on and begin recording video with his NYPD body-camera the instant that he and Mr. Perez illegally stopped me in that public passageway that he was required to do or **b)** he did record such video with that body-camera in that passageway before he or other members of the NYPD's criminal mob illegally tampered with that video recording and deleted parts from its that were recorded before 7:17 pm on 12/26/17 of my interactions with Mr. Harris and Mr. Perez. Mr. Harris and Mr. Perez also illegally didn't prepare what is known as a "Stop Report" that they were required to do for having illegally stopped me in that passageway. Although Mr. Harris fraudulently claimed that the reason why he thereafter again illegally stopped and seized me near the intersection of East 176th Street and Clinton Avenue on 12/26/17 while he illegally refused to show me his NYPD badge number was because he believed that I was an emotionally disturbed

person, an audio recording exists that was recorded on 12/26/17 of a member of the NYPD

telling another member of the NYPD that I wasn't an emotionally disturbed person. In short, Mr.

Harris also proved that not all Black Lives Matter because his certainly doesn't and he illegally

performed yet another illegal stop and failure to properly use his NYPD body-camera about 4

months after meeting me instead of having been properly and promptly fired from the NYPD's

mob and prosecuted for his actions against me on 12/26/17. Also, *People v. Komatsu* continued

to be illegally maintained against me after the NYPD voided the trespass charge prior to 6/23/18.

Through *USA v. Komatsu*, I learned that the USMS or some other federal government agency's

personnel conducted a background check about me. The next 3 screenshots are from a report that

I received as a result of that case that corresponds to a background check that was conducted of

me by federal government personnel. These screenshots are from the same page of a NYPD

report about me and confirm that the trespass charge that was filed against me that caused *People*

*v. Komatsu* to have been commenced was voided prior to 6/23/18 that is the date of this report.

The voiding of that trespass charge caused mootness to apply and required the immediate

dismissal of *People v. Komatsu*.

 

# TOWAKI KOMATSU
# RTCC SUMMARY

| ARRESTS | | | | |
|---|---|---|---|---|
| Date | Law Code | Sealed or Voided | Precinct | Arrest Number (Includes Check Digit) |
| 12/26/2017 | ASLT:POLICE OFF/FIREMAN/EMT RESISTING ARREST OBSTRUCT GOVERNMENTL ADMIN-2ND CRIMINAL TRESPASS-3RD | Voided | 048 | B17664729-Z |

| Run On: Jun 22, 2018 12:06:57 PM | -8- | REAL TIME CRIME CENTER |
|---|---|---|
| Run By: ██████████ | | Case #: 998 |

The dismissal and sealing of _People v. Komatsu_ on 1/23/20 occurred before the USMS' criminal

mob violated Judge Collins' sealing order after that date by keeping an image of my face that

was from that case on a tablet computer's screen in the security screening area in the TM

courthouse near its main entrance. The USMS continued to do that after I apprised CSOs that the

USMS was violating her sealing order by doing so. Oops. Also, _People v. Komatsu_ was

commenced against me just 6 days after I recorded the Mayor on audio at the end of the public

town hall meeting that he conducted in Brooklyn as he tried to harass and intimidate me by

ordering me to stop coming to public meetings that he conducted in flagrant violation of my First

Amendment and Fourteenth Amendment rights. That audio recording that I recorded at 9:35 pm

is available on the Internet at

https://drive.google.com/file/d/1EE9E4UMI5G5ur_YdPPizwcEzApmOx_zk/view?usp=sharing.

At the elapsed time of 3 minutes and 9 seconds in that recording, I'm heard as I talked to the

Mayor and matter-of-factly said the following to him:

> "We met on July 18th. You said that uh, Mr. Banks would do as he says. He hasn't done that
> in 5 months."

The Mayor is then heard in that audio recording as he responded to me by saying the following

to me in an irritated manner:

> "We've been over it a couple times. I don't know why you keep coming back." "I've raised it
> to him. He's looked at it. He's given you an answer. I'm sorry. We're done. Stop coming
> back."

Immediately after the Mayor stated the preceding remarks to me in that audio recording, I'm

heard in it as I stated the following in sequence to him and Marco Carrion while Mr. Carrion was

then the Commissioner of the Mayor's Community Affairs Unit and stood nearby:

> a. "First Amendment, Sir." That remark by me was addressed to the Mayor to emphatically
>    point out to him that I had a First Amendment right to attend all public forums that he
>    conducted and was in direct response to how he had just tried to illegally intimidate me

by directing me to stop attending public forums that he conducted.

b.   "So that was Bill de Blasio lying to me, um…" I said that to identify the Mayor as the person who had just talked with.

c.   "See? This is what happens. He just lied to me…again." I directed these remarks to Mr. Carrion as he stood nearby and Mr. Carrion is heard saying "Okay" to me in response.

d.   "I'll talk to the reporters." This remark by me was also to Mr. Carrion.

e.   "He also told me to stop coming back, so that's, um…intimidation right there." Mr. Carrion is heard saying "Okay" to me in response.

During that same town hall meeting, Mr. Redmond and other members of the NYPD's criminal mob and Mayor's CAU illegally caused members of the public to be ejected from it in violation of my First Amendment right to continue to hear what they had to say then and there as they lawfully protested against the Mayor's rezoning and affordable housing policies. The following is a link to a video recording that I recorded at 7:48 pm on 12/20/17 as Mr. Redmond and other City of New York personnel that included Pinny Ringel of the Mayor's CAU harassed a fantastic group of people as Mr. Ringel and Mr. Redmond violated my right to continue to hear what those people had to say:

https://drive.google.com/file/d/1D9wIPRjvdcz7wMhedaqtd_XIrFP8yCby/view?usp=sharing

The next screenshot is from the elapsed time of 30 seconds in that video and shows Mr. Ringel as he stood on the left while Mr. Redmond stood and appeared on the right in front of Marco Carrion of the Mayor CAU.



The next screenshot is from that same video and shows Mr. Redmond as he was accosting a woman while illegally coercing her to leave the room in which that town hall meeting was being conducted as he and others that included Harold Miller of the Mayor's CAU illegally interfered with my First Amendment right to receive information from those who were being coerced to leave that town hall meeting.



Mr. Redmond appears with his left arm outstretched in this screenshot in front of America's flag that he and every other member of the NYPD's mob metaphorically defecate on each and every time that they violate the constitutional rights of New Yorkers. A news censor in journalism named Jacob Kornbluh also is shown in this screenshot as he wore eyeglasses and sat in front of that flag.

By granting me the ability to intervene in this case, you will offer me a somewhat suitable platform to have a seat at the table to help propose effective remedies to deal with a plague in New York City that is the NYPD that has long been supported by the Mayor, Ms. James, the City Council, and whistleblower news censors in journalism through their apathy, complacency, and ratification of how that garbage operates. At over 100 pages of mostly relevant material, I have certainly provided you ample grounds to grant this application to let me intervene in this case as of right pursuant to FRCP Rule 24(a)(2), permissive intervention pursuant to FRCP Rule 24(b) in order to intervene in this case as an interested party, or to appear in it as an amicus curiae in the alternative.

To close out this letter, I'll remind you about how apathy and complacency allowed crimes by federal court security terrorist Ralph Morales, other CSOs, and the USMS to go unchecked by you and other federal judges before Mr. Morales engaged in terrorism against me on 8/8/18 inside of the DPM on its first floor by assaulting me in a manner that is very to how he was described in a CCRB report as having assaulted someone years earlier while he was a member of the NYPD's criminal mob and accused of choking someone while taking that person to the ground. Some people don't change their behavior and dog shit like Mr. Morales is one such beast that Judge Gorenstein and others have long sucked up to.

The first exhibit that appears within the annexed **Exhibit A** is a copy of the letter dated 3/14/18 that I submitted to you. That letter is about illegal acts by CSOs involving criminal assaults against me since February of 2018 inside of the DPM courthouse on its first floor that were recorded on video by video security cameras that were controlled by the USMS' criminal mob. **Exhibit A**'s second exhibit is an excerpt from the 3/23/18 notice that I received from the Pro Se Intake Unit in response to my two letters to you in March of 2018. That notice made it clear that you wouldn't intervene on my behalf against criminals who were masquerading as CSOs inside of the DPM and TM while committing illegal acts and omissions against me since February of 2018. That notice informed me that I would need to commence a lawsuit to have that addressed as I was then too burdened by other litigation and other matters to do so. The following excerpts from *US v. Smith*, 426 F.3d 567 (2d Cir. 2005) confirm that I shouldn't have needed to commence litigation to have illegal acts and omissions by CSOs and members of the USMS against me inside of an in the immediate vicinity of the DPM and TM courthouses properly and promptly resolved in my favor by having you exercise proper control of court in that regard:

a. "While the Marshals Service and Secretary of DHS are charged by Congress with protecting the federal courts, *see* 28 U.S.C. § 566; 40 U.S.C. § 1315, the Supreme Court has made clear that "courtroom and courthouse premises are subject to the control of the court.""

b. "It is [the district judge] who is best equipped to decide the extent to which security measures should be adopted".

c. "Control by the courts is essential".

d. "It is especially important that the judiciary maintain control of security measures that may affect those having business before the courts, because of the danger that litigants could be excluded from the courtroom and procedurally penalized for their absence through no fault of their own and without the knowledge of the court. For these reasons, we expect the Marshals Service to consult with the courts before implementing general security measures that significantly affect court access. Such restrictions should then be approved by the judiciary through, for example, their relevant court security committees."

**Exhibit A**'s third exhibit is a letter that I received on or about 6/1/18 from someone who signed it with the signature of Katherine Day of the U.S. Marshals Service's Freedom of Information Act ("FOIA") division in which that person claimed that the USMS would provide me video recordings that were recorded on 3/13/18 and 3/14/18 inside of the DPM courthouse in response to a FOIA demand that I submitted to the USMS. The following is a link to a video recording on the Internet that I recorded on 8/20/18 as I played back a voicemail message that I received on that date from Katherine Day as she stated in that voicemail that she was aware that I was informed by her office that I would be provided video recordings that were recorded on 3/13/18 and 3/14/18 inside of the DPM courthouse by video security cameras that were controlled by the USMS:

https://drive.google.com/open?id=1BYPrd9EBuVYXC9HTuEAs_D6KFKMvW36j

That same video recording also recorded her stating in her voicemail that those video recordings from 3/13/18 and 3/14/18 were recorded over by the USMS in flagrant violation of my rights pursuant to FOIA and the First Amendment. That confirmed that the USMS criminal illegally

covered-up material and substantial evidence of CSOs committing illegal acts against me in the DPM courthouse that you're supposed to properly oversee as its Chief Judge and inexcusably haven't been doing. Shape up or ship out!


Sincerely,

Towaki Komatsu


s_/Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY  10460

Tel: 347-872-1205
E-mail: Towaki_Komatsu@yahoo.com

# Exhibit A

### Contents                                                                                       Page

1.   3/14/18 letter from me to Chief Judge McMahon about abuse by CSOs.................................A1

2.   Excerpt from the 3/23/18 notice that I received from the Pro Se Intake Unit in
     response to my two letters to you in March of 2018.................................................A5

3.   Letter I received on or about 6/1/18 from someone who signed it with the signature
     of Katherine Day of the U.S. Marshals Service's Freedom of Information Act
     division in which that person claimed that the USMS would provide me video
     recordings that were recorded on 3/13/18 and 3/14/18 inside of the Daniel Patrick
     Moynihan federal courthouse in response to a Freedom of Information Act demand
     that I submitted to the USMS.................................................A6

March 14, 2018

Hon. Colleen McMahon
Chief U.S. District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 24A
New York, NY  10007

      Re:    Complaint about new abuse against me on 3/13/18 by court security officers
                   inside of the Daniel Patrick Moynihan federal courthouse

Chief Judge McMahon,

After having submitted a letter dated 3/5/18 addressed to you to your courthouse located at 500

Pearl Street in Manhattan on or about that same date that concerned flagrant abuse to which I

was subjected on 2/28/18 in and outside of the Worth Street entrance to your courthouse by court

security officers and U.S. marshals that violated all of the following laws, I was subjected to

further abuse yesterday in your courthouse by 4 court security officers in the security screening

area located inside of the Worth Street entrance at roughly 3:15 pm and involved the 2 court

security officers that instigated the abuse that I experienced in your courthouse on 2/28/18:

1. 18 U.S.C. § 245(b)(5), 18 U.S.C. § 241, 18 U.S.C. § 1512

2. My rights under the First and Fourteenth Amendment of the U.S. Constitution.

3. New York State Penal Code § 240.26 that concerns harassment in the second degree and

    includes the following plain language in defining the type of conduct that constitutes such

    harassment:

> "He or she engages in a course of conduct or repeatedly commits acts which alarm or
> seriously annoy such other person and which serve no legitimate purpose."

When I entered your courthouse yesterday, I did so primarily to conduct legal research. Upon

being directed by the first court security officer I encountered in it to proceed to one of the

security screening areas where there is a metal detector and x-ray machine, I immediately

encountered the court security who was primarily responsible for instigating the abuse to which I was subjected on 2/28/18 in your courthouse and stood to my right on that date while I waited in line to proceed to the security screening area. Upon encountering him yesterday, I conducted myself in an entirely lawful manner and neither spoke nor gestured to him. Instead, I made a concerted effort to study his name badge closely to follow-up on complaints I made about my 2/28/18 abuse by him and others in and outside of your courthouse. Upon being cleared to be able to walk through the metal detector, I did so and immediately encountered the second court security officer who was abusive toward me on 2/28/18. At that point, I asked him to provide me with his name and told him that the basis for my request was to follow-up on valid complaints I had made against him and his team for having been abusive toward me on 2/28/18 and to try to have him prosecuted for his behavior. He immediately responded to what I stated by telling me that he was interested in repeating the abuse that he and others committed against me on 2/28/18. Shortly thereafter and without any provocation by me, the first court security officer who was abusive toward me on 2/28/18 and that I met again yesterday immediately prior to walking through the x-ray machine in your courthouse became verbally abusive toward me by calling me a dummy and smart-ass while lying by telling other court security officers near him that I sought to bust his team's chops. In doing so, he flagrantly harassed me and retaliated against me for my lawful exercise of my First Amendment rights yesterday. As matters continued to become heated between those two court security officers and I because of their harassment against that I understandably refused to tolerate and back down to, I asked a third court security officer standing near me for his name because he was witnessing the confrontation. Instead, he wrongfully defended the abuse his colleagues were illegally subjecting me to, as I pointed to all of them that security cameras above us were likely recording the fact that I was conducting

myself lawfully at that time while they were instead being abusive toward me. A short time later, a fourth court security officer approached me from the area in your courthouse where visitors check-in their electronic devices. When I immediately told him that I was being harassed by his colleagues and that I was lawfully exercising my First Amendment rights primarily to try to get the names of those who had been abusive toward me on 2/28/18 to follow-up on those complaints and to report new complaints to the U.S. Marshals office located on the 4th floor of your courthouse against them because they chose to again be abusive toward me yesterday, he asked me if I knew what the definition of harassment was. I told him that I did and what its legal definition is. As his colleagues continues to raise their voices toward me and he asked me if I was going to cry because of how they were verbally harassing me, I told him that I previously met with the Brian McHugh of the U.S. Marshals on the 4th floor of your courthouse to report complaints about the 2/28/18 abuse and that I sought to do so again because of how I was being abused yesterday in your courthouse. In response, he told me that whatever complaint I made to Mr. McHugh would go straight back to him. He then lied to me by telling me that I was being disorderly and threatened to arrest me if I didn't leave your courthouse within 3 seconds. He next directed me to leave your courthouse through its Worth Street exit and through the right side of that hallway, despite the fact that it was roped off that made it somewhat unsafe to do so.

On 3/8/18, Judge Naomi Reice made the following remark during a court hearing that took place in your courthouse for oral arguments:

> "Once it is a public forum, you can't shut somebody up because you don't like what they're saying."

When she made this remark, she did so in the case of _Knight First Amendment Institute at Columbia University et al v. Trump et al_ (case #: 17-CV-5205). The relevance of the remark

Judge Reice made is that the court security officers clearly subjected me to illegal viewpoint discrimination and retaliation against me in response to my having lawfully exercised my First Amendment rights.

Prior to writing you this letter, I hoped you would take swift and decisive corrective action against the those I discussed in my previous letter to you. Clearly, that hasn't happened and I was subjected to illegal abuse yesterday in your courthouse. Therefore, I will escalate this further by providing a copy of this letter to journalists, other government officials that include the U.S. Attorney's office, civil rights attorneys, and more to seek an end to such illegal behavior in your courthouse.

As I previously requested, I urge you to watch the video footage that your courthouse's security cameras recorded of the interactions I had with those court security officers yesterday to get independent verification that the statements I have expressed in this letter seem to be supported by what is shown on that video footage. I also would appreciate it if you would arrange for me to be immediately provided with **a)** the relevant video footage from yesterday that shows the interactions that I had with those court security officers in your courthouse and **b)** their names in order to commence valid litigation against them.

From,


Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY 10460

E-mail: Towaki_Komatsu@yahoo.com



**United States District Court**
**Southern District of New York**
*Pro Se Intake Unit*

**To:**       Towaki Komatsu
**From:**    Pro Se Intake Unit
**Date:**    March 23, 2018
**Re:**

The attached document, which was received by the Pro Se Intake Unit on March 16, 2018, is being returned to you for the following reason or reasons:

If you wish to file a lawsuit, please complete the attached forms and return them to the Pro Se Intake Unit.

Please contact the Pro Se Intake Unit if you have any questions.

A5



**U.S. Department of Justice**

United States Marshals Service

*Office of General Counsel*

*Washington, DC 20530-0001*
(703) 740-3943

Mr. Towaki Komatsu
802 Fairmount Place, Apt. 4B
Bronx, NY 10460

RE:   Freedom of Information/Privacy Act Request No. 2018USMS32703
      Subject: Video Footage and Names of Court Security Officers

Dear Mr. Komatsu:

The United States Marshals Service (USMS) is in responding to your Freedom of Information/Privacy Act (FOIA/PA) request for video footage from the security cameras at the federal courthouse located at 500 Pearl Street in New York, New York recording your interactions with court security officers on March 13, 2018 and March 14, 2018, and the full names of the court security officers.

Pursuant to your request, the Marshals Service conducted a search of its files in the Southern District of New York and the Office of Professional Responsibility and located video footage which is responsive to your request, which has been placed on a disk. After carefully reviewing the footage, we determined that it is appropriate for release. The disk is released with this letter.

Your request for the names of the court security officers is denied pursuant to exemptions (b)(6) and  (b) 7(C) of  the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Exemption (b)(6) concerns the withholding of information in personnel, medical and similar files the release of which would constitute a clearly unwarranted invasion of personal privacy of third parties   Exemption (b)(7)(C) concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home.portal.html.   Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information/ Privacy Act Appeal." '

Sincerely,

Katherine A. Day
Associate General Counsel/FOIPA Officer
Office of General Counsel