UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

NEW YORK CITY POLICING DURING SUMMER
2020 DEMONSTRATIONS

20 Civ. 8924(CM)(GWG)

**CITY OF NEW YORK'S MEMORANDUM OF LAW
IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTION
FOR AN ORDER COMPELLING THE CITY TO IMPLEMENT
PARAGRAPH 89(h) OF THE STIPULATED ORDER**

**MURIEL GOODE-TRUFANT**
CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007

By:    Tobias E. Zimmerman
       *Senior Counsel*
       Special Federal Litigation Division
       (212) 356-2423

Dated May 21, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

BACKGROUND .............................................................................. 2

ARGUMENT ................................................................................... 5

POINT I:    THE PLAIN LANGUAGE OF THE SETTLEMENT AGREEMENT
LIMITS APPLICATION OF PARAGRAPH 89(h) TO MAJOR
INCIDENTS ...................................................................5

    A.    "Incident Commander" is a Term of Art Under the Settlement
Agreement .............................................................. 7

    B.    Plaintiffs' Misinterpret DCPI's Role ...................................... 8

    C.    The Scope of "Red Light Offenses" Only Warrants Special
Treatment At FAAs and Other Major Deployments............................. 9

POINT II:    ALL MEMBERS OF THE PUBLIC ALREADY RECEIVE THE
TYPE OF PROTECTION PLAINTIFFS DEMAND FOR
NEWSGATHERING ..........................................................10

POINT III:    APPLYING SUBPARAGRAPH 89(h) TO ROUTINE ARRESTS
WOULD CONVEY SPECIAL PRIVILEGES ON EVERYONE
CLAIMING TO BE A MEMBER OF THE PRESS .......................................11

CONCLUSION ................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*CVS Pharmacy, Inc. v. Press Am., Inc.*,
    377 F. Supp. 3d 359 (S.D.N.Y. 2019)...................................................................................3

*Doe v. Pataki*,
    481 F.3d 69 (2d Cir. 2007)............................................................................................5

*Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*,
    88 N.Y.2d 347 (1996)..................................................................................................5

*Reyes v. City of New York*,
    No. 23-CV-6369 (JGLC), 2023 U.S. Dist. LEXIS 196602 (S.D.N.Y.)..................................11

*United States v. Mizrahi*,
    No. 22-CR-650 (JPO), 2024 U.S. Dist. LEXIS 35748 (S.D.N.Y.).......................................13

*W.W.W. Assocs. v. Giancontieri*,
    77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).........................................3

**Statutes**

N.Y. Civ. Rights Law § 79-P ............................................................................................11

N.Y. Penal Law § 240.20(2) ............................................................................................12

**Other Authorities**

N.Y.C. Charter § 2604(b)(3)............................................................................................13

N.Y.C. Admin. Code § 14-189 ........................................................................................11

RESTATEMENT 2D OF CONTRACTS, § 203(a)........................................................................7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

NEW YORK CITY POLICING DURING SUMMER
2020 DEMONSTRATIONS

20 Civ. 8924(CM)(GWG)

**CITY OF NEW YORK'S MEMORANDUM OF LAW
IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTION
FOR AN ORDER COMPELLING THE CITY TO IMPLEMENT
PARAGRAPH 89(h) OF THE STIPULATED ORDER**

Defendant City of New York, by its attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, respectfully submits this Memorandum of Law in opposition to the Consolidated Plaintiffs' Motion for an Order Compelling the City to Implement Paragraph 89(h) of the Stipulated Agreement (ECF Nos. 1193 to 1197). As set forth below, the City asserts that it *has* fully implemented the referenced provision of the parties' Equitable Settlement Agreement, and that the moving Plaintiffs are seeking an interpretation of that provision that is neither supported by the language of the agreement nor consistent with the intent of the parties. The City therefore respectfully requests that the Court enter an order denying Consolidated Plaintiffs' motion and granting such other relief as the Court deems appropriate.

**PRELIMINARY STATEMENT**

The motion of certain Consolidated Plaintiffs implicates a single provision in the Stipulated Order Pursuant to Fed. R. Civ. P. 42(a)(2) (ECF Nos. 1099-2 and 1166-1; entered at ECF No. 1167) (hereinafter "the Settlement Agreement"). That provision, subparagraph 89(h) provides for special treatment of members of the press in particular circumstances. Consistent with the scope, function, and understanding of the Settlement Agreement as a whole, the City contends that the "particular circumstances" are limited to those instances when individuals claiming protection under the Settlement Agreement can reasonably be expected to be participating in the type of First Amendment

Activities that were the focus of this litigation.  The Consolidated Plaintiffs, however, unreasonably contend that the disputed provision applies in *all* circumstances and therefore turns any press identification card into a "Get Out of Jail Free" card for certain offenses committed in the City of New York.  That position is not supported by the plain language of the Settlement Agreement, the expectations of the parties, or common sense.

## **<u>BACKGROUND</u>**

The City assumes the Court's familiarity with the factual and procedural history these consolidated cases and the Settlement Agreement.  Only the issues directly relevant to the instant motion are recounted here.

The dispute at issue here concerns Plaintiffs in consolidated case *Grey, et al. v. City of New York, et al.*, No 21 Civ. 6610.  That case was brought by five professional journalists who alleged that, between February and July of 2020, each of them was arrested by members of the New York City Police Department (NYPD) while documenting police activity in a public place.  *See generally* Third Amended Complaint ("TAC") (*Grey* Dkt. No. 124).  The *Grey* Plaintiffs alleged that their arrests were the result of the City of New York's unconstitutional policies that allowed police officers to interfere with individuals' constitutional rights to record police activity.  *Id.*  In their prayer for relief, the *Grey* Plaintiffs requested:

> Injunctive relief (i) enjoining the City of New York, acting through the NYPD, from interfering with, targeting, arresting, or using physical force against, members of the press and public who are peacefully recording police activity in public places; and (ii) ordering the City of New York to develop and implement a comprehensive and effective policy of training, supervision, and discipline of NYPD officers to protect the First Amendment rights of the press and public to observe and record police activity in public places, including appropriate procedures to test the effectiveness of that policy[.]

TAC at p. 84 (subparagraph "d").

The *Grey* case was consolidated under the caption above by order dated September 27, 2021. *See Grey* Dkt. Nos. 19 & 25. The *Grey* Plaintiffs were well represented during the protracted settlement negotiations that resulted in the Settlement Agreement. *See, e.g.*, Everdell Declaration (ECF No. 1197) at Exhibits I & J.[1] The Parties, including the *Grey* Plaintiffs, eventually negotiated the Settlement Agreement with the shared "goal of an approach to policing that assures the rights of protesters, journalists and legal observers and uses arrest and force only when necessary and in compliance with the Constitution of the United States and the Constitution and laws of the State of New York and the New York City Charter and local laws." Settlement Agreement at p. 2 (9th Whereas clause). To accomplish that goal, the Parties agreed to a phased settlement, in which the first phase would involve NYPD revising its policies and training with input from the Plaintiffs. The present dispute arises from a single provision of the Settlement Agreement.

The Settlement Agreement language at issue is the following:

> 89. During Phase I (as defined in the Oversight section below) NYPD shall institute policies, protocols, and updates to the Patrol Guide and Administrative Guide relating to the NYPD's interactions with members of the press applicable to both FAA[2] and non-FAA related circumstances, which shall include the following:
>
> a. . . .

*     *     *

---

[1] The City cites to these exhibits submitted by Plaintiffs only for the purpose of demonstrating that the *Grey* Plaintiffs were represented during negotiations. The City disputes the admissibility or relevance of the proffered drafts and communications from the negotiations because "[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990)).

[2] First Amendment Activity. *See* Settlement Agreement at ¶ 6.

h. Where a member of the press is arrested for any Red Light offense(s) and presents a MOME[3] press credential or an official government-issued press credential from another jurisdiction or government agency, process for that arrest shall be approved by the Incident Commander and/or DCPI[4] personnel at the time of the arrest. If such member of the press is arrested for a C-summons-eligible Red Light offense, the presumption shall be that the arrested member of the press will be issued process at the point of encounter. Such arrested member of the press may be removed to an arrest processing facility or otherwise transported to another location only in those instances where the Incident Commander determines that issuing process at the point of encounter would create a health and/or safety risk to officers or any other individual. In the event the member of the press is presenting a government-issued press credential from another jurisdiction or government agency, this shall be verified, to the extent possible, at the time of encounter. In a circumstance where the validity of the press credential is unable to be verified on scene, officers shall consider the following as indicia of the credential being valid: the identification contains a name which matches another form of identification, contains a photograph of the individual, details the issuing city or agency, includes the associated media outlet or indicates whether that individual is independent, includes an expiration date, or includes a serial or identification number.

While there is no dispute that the bulk of the provisions under paragraph 89 apply globally, regardless of context, the question at issue is whether subparagraph 89(h) applies in "both FAA and non-FAA related circumstances."  Plaintiffs contend that it is a blanket restriction on NYPD's ability to arrest any person possessing a press card at any time and in any circumstances when the arrest is for certain low-level offenses including trespass and disorderly conduct.  The City contends that subparagraph 89(h) can only be logically read to apply at large-scale events where NYPD mobilization would call for the appointment of an "Incident Commander" and members of the DCPI staff would be expected to be on scene.  Moreover, the City contends that reading subparagraph 89(h)

---

[3] Mayor's Office of Media Engagement.

[4] Deputy Commissioner of Public Information.

to apply in all circumstances would not only be impossible to implement but would also convey upon Plaintiffs privileges above and beyond those necessary to protect their rights, and to which they are not entitled, and which the City did not agree to grant them.

## ARGUMENT IN OPPOSITION TO
## CONSOLIDATED PLAINTIFFS' MOTION

This Court has expressly retained jurisdiction to enforce the terms of the Settlement Agreement. *See* Order dated April 17, 2024 (ECF No. 1167). The City concurs with Plaintiffs that the Settlement Agreement is a contractually binding agreement between the parties, and "ordinary rules of contract interpretation are generally applicable." Consolidated Plaintiffs' Memorandum of Law (ECF No. 1194) ("Ps.' Mem.") at 9 (quoting *Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007)). However, the City contends that those "ordinary rules" only support a reading of paragraph 89 that limits the applicability of subpart (h) to situations where there would be an "Incident Commander" and an expectation that DCPI would be directly involved. *See Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*, 88 N.Y.2d 347, 352 (1996) ("provisions in a contract are not ambiguous merely because the parties interpret them differently[.]"). Moreover, the protections for legitimate newsgathering that Plaintiffs purport to seek are already encompassed in state and local statutes, and new and existing NYPD policies. Finally, extending the special treatment of the press outlined in the disputed paragraph to *all* other contexts would convey a benefit upon Plaintiffs that does not advance the stated goals of the litigation and the Settlement Agreement and is not consistent with the City's intent and understanding when it entered into the Settlement Agreement.

## POINT I
## THE PLAIN LANGUAGE OF THE SETTLEMENT AGREEMENT
## LIMITS APPLICATION OF PARAGRAPH 89(h) TO MAJOR INCIDENTS

Plaintiffs rely heavily on the introductory language of paragraph 89, which states that the policy and training updates contemplated by the parties will be "applicable to both FAA and non-

FAA related circumstances. . . ."  Settlement Agreement ¶ 89.  Following that language are nine subparagraphs setting forth specific changes to policy, procedure, and training specific to "NYPD's interactions with members of the press. . . ."  *Id*. at ¶¶ 89 & 89(a)–(i).  The parties dispute the scope of only one of those nine subparagraphs, and the City has already implemented the general reforms specified in the other eight.  The City contends that the plain language of subparagraph 89(h) limits its applicability to large-scale events where NYPD engages in a major deployment and journalists on scene are entitled to a strong presumption that they are engaged in constitutionally protected newsgathering.  Attempting to apply subparagraph 89(h) outside the context of FAAs or other large-scale deployments would be impossible and would be far beyond what the parties bargained for.

Three portions of the disputed paragraph clearly limit its applicability to large-scale deployments.  First, the reference to "Incident Commander" *only* makes sense in the context of large-scale deployments generally and—in the context of the Settlement Agreement—to FAAs occurring under the new policies and practices.  Second, the assumption that DCPI personnel would be available to mediate disputes between officers and putative members of the press is only valid in situations where DCPI would ordinarily be deployed to the scene, which only occurs during large-scale mobilizations.  Finally, while not completely dispositive, the reference to "Red Light Offenses"— a term expressly defined in the context of policing FAAs—strongly indicates the Parties' intent to limit subparagraph 89(h) to contexts where officers are already expected to employ the "Red Light/Green Light" protocol for arrests.  Taken together, these aspects of subparagraph 89(h) leave little doubt that it was written to encompass only certain arrests in specific circumstances and was not meant as a blanket immunity allowing credentialed journalists to avoid all arrests for certain low-level offenses regardless of where or when they occur.

## A.    "Incident Commander" is a Term of Art Under the Settlement Agreement

The Settlement Agreement does not explicitly define the term "Incident Commander", but it uses the term nearly thirty times, and in every instance it is clearly referencing the Incident Commander at an FAA. *See, e.g.*, Settlement Agreement at ¶ 23 ("NYPD will continue to designate an Incident Commander at each FAA. . ."); *id.* at ¶ 24 ("NYPD shall document the identity of the Incident Commander in the After-Action Report [created to document FAAs]."); *id.* at ¶ 27 ("Unless infeasible under the specific circumstances of the FAA, changes in Incident Commander must be documented. . ."); *and id.* at ¶¶ 43, 50, & 58–59 (Incident Commander's involvement required in all decisions to escalate FAA response to higher tiers).  Read in the context of the Settlement Agreement, the reference to "Incident Commander" in subparagraph 89(h) can only be understood to mean the designated Incident Commander at an FAA.

During the meet-and-confer process, Plaintiffs pointed out that the Patrol Guide makes other references to "Incident Commander" outside of the context of FAAs. *See* Everdell Decl. Exhibit G at 1.  But those other references merely support the City's position that subparagraph 89(h) is only meant to apply in situations that call for a large-scale deployment by NYPD. *See id.* (referencing P.G. 212-17 (incident commander at "scenes of critical situations on New York City Transit"), P.G. 212-101 (scene of any "chemical, biological, radiological, nuclear (CRBN), hazardous material incidents", P.G. 213-02 ("emergency incidents") and P.G. 213-03 ("unusual disorder/emergency incident.")).  Since the designation of an "Incident Commander" only occurs in large deployments, the Plaintiffs' proposed reading that requires an "Incident Commander" to approve certain low-level arrests during routine citizen-police encounters would render subparagraph 89(h) nonsensical and impossible to implement.  Thus, the City's interpretation of the disputed language should be sustained by the Court.  *See* Restat. 2d of Contracts, § 203(a) ("an

interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation that leaves a part unreasonable, unlawful, or of no effect.").

### B.  Plaintiffs' Misinterpret DCPI's Role

The disputed provision's reference to DCPI similarly limits its practical applicability to large-scale deployments where DCPI would reasonably be expected to have personnel on scene.

The Office of the DCPI is "responsible for communication, reputational management, and facilitating citywide news coverage for members of the press." <u>Public Information, New York City Police Department</u> (hereinafter "DCPI Webpage").[5]  DCPI personnel "are available [by telephone] 24 hours a day, seven days a week, to assist *members of the media* with stories, breaking news, or other inquiries *they* may have." *Id.* (emphasis added).  DCPI personnel only respond in person "to events . . . that generate *a large media presence* such as major crime scenes, parades, demonstrations and disasters. . . ." *Id.* (emphasis added).  Plaintiffs cite to identical language in a note to Patrol Guide section 212-49 to argue that DCPI is already involved with all arrests involving members of the media.  *See* Ps.' Mem. at 12.  But Plaintiffs' reading of that language overemphasizes or misstates DCPI's role.

While it is true that police procedure calls for notification of DCPI when there is an incident involving members of the press, that notification is not expected to occur in real-time while officers on the ground are making split-second decisions on whether to exercise their police powers.  *See* Declaration of Inspector Aaron Edwards ("Edwards Decl.") at ¶¶ 3–8.[6]  Rather, the purpose of notifying DCPI of routine incidents, such as assaults on reporters or low-level arrests involving members of the media, is to facilitate DCPI's mission of "reputational management" and assist it

---

[5] https://www.nyc.gov/site/nypd/bureaus/administrative/public-information.page (visited May 16, 2025)

[6] Inspector Edwards's Declaration will be filed contemporaneously with this memorandum.

with "facilitating citywide news coverage." DCPI Webpage. The DCPI personnel available by telephone "24 hours a day" are not trained, nor expected, to participate in arrest decisions by members of service in the field. *See* Edwards Decl. at ¶¶ 3–8. Thus, subparagraph 89(h)'s allowance for DCPI approval "at the time of arrest" is clearly meant to encompass those situations where DCPI personnel would ordinarily deploy in the field, *i.e.* at "events . . . that generate a large media presence such a major crime scenes, parades, demonstrations and disasters. . . ." DCPI Webpage; *see also* Edwards Decl. at ¶ 4.

It would be unrealistic, and likely impossible, to require that regular line officers consult with DCPI in every instance where they are making an arrest for a low-level offense and the arrestee claims protections afforded to members of the press. Requiring officers to make a fact determination on the validity of a proffered press pass makes sense at large-scale events where it is assumed that members of the press are present for the purpose of newsgathering; the same cannot be said for situations where an individual is attempting to avoid arrest for a low-level offense that occurs in other contexts.[7]

C.    **The Scope of "Red Light Offenses" Only Warrants Special Treatment At FAAs and Other Major Deployments**

Plaintiffs over-emphasize the City's arguments concerning the scope of "Red Light offenses". *See* Ps.' Mem. at 11. At the same time, Plaintiffs seek to extend the applicability of the "Red Light" terminology too far when they argue that FAAs are not specifically mentioned in paragraph 29 of the Settlement Agreement, where the term "Red Light offenses" is defined. *Id.* While it is true that paragraph 29 does not, itself, reference FAAs, it appears under the heading

---

[7] The difficulty in validating a claim of press membership is demonstrated by the very language of subparagraph 89(h) where it discusses the "indicia" of the putative validity of a press pass presented to an officer.

"Policies and Procedures Governing Arrests at FAAs — The Red Light/Green Light Policy and Mass Arrest Processing". Settlement Agreement at p.6 (heading "B"). Moreover, "Red Light offenses" "are those offenses that require the approval of someone at the rank of Captain or above before any officer may make an authorized arrest." Settlement Agreement at ¶ 28. Reading that section of the Settlement Agreement in context, the "Red Light/Green Light" paradigm can have little meaning outside the scope of FAAs where the approval of a "Captain or above" would be readily obtainable from a supervisor on the scene. In the routine situations faced by NYPD officers every day, it would be impractical or impossible to seek the approval of a Captain or higher rank every time an officer has probable cause to arrest someone for certain low-level offenses.

Taken together, the references to "Incident Commander", "DCPI personnel", and "Red Light offense[s]" in subparagraph 89(h) clearly limit the applicability of that provision to the context of FAAs and other large-scale deployments where those concepts make sense.

**POINT II**
**ALL MEMBERS OF THE PUBLIC**
**ALREADY RECEIVE THE TYPE OF PROTECTION**
**PLAINTIFFS DEMAND FOR NEWSGATHERING**

Plaintiffs rely heavily on the allegations leveled by Plaintiff Amir Alfiky to argue that the Settlement Agreement was clearly meant to apply outside the scope of FAAs. Ps.' Mem. at 15. Mr. Alfiky alleged that he was arrested in February 2020 (prior to the onset of the protests at issue) and charged with disorderly conduct (a "Red Light" offense) for "filming the arrest of an apparently mentally disturbed man from across the street." Ps.' Mem. at 4 (citing *Grey* Third Amended Complaint at ¶ 86–96). But even if all of Mr. Alfiky's allegations are taken as true, the circumstances of his arrest do not justify or warrant a widescale change in NYPD policy—either at time the Settlement Agreement was negotiated or presently—because the alleged conduct was and is already contrary to law and NYPD policy.

10

The rights of citizens to record and document police activity in New York City is explicitly protected by state and local statute.  *See* N.Y. Civ. Rights Law § 79-P[8] (N.Y. Sen. Bill 2019-S3253A, a/k/a "New Yorker's right to monitor act"); N.Y.C. Admin. Code § 14-189 (Right to record police activities).  The rights codified in those statutes are fully reflected in NYPD's existing policy.  *See, e.g.*, *Reyes v. City of New York*, No. 23-CV-6369 (JGLC), 2023 U.S. Dist. LEXIS 196602, at *33–34 (S.D.N.Y.) (quoting NYPD Legal Bureau Bulletin).  Moreover, insofar as Mr. Alfiky alleges he was arrested without probable cause, such conduct has long been prohibited by the Fourth Amendment.  Those existing protections were expressly discussed during the settlement negotiations and incorporated into the other subparts of paragraph 89.  *See, e.g.*, Settlement Agreement at ¶¶ 89(a) & (b); *see also* Settlement Agreement at ¶ 59 ("Nothing in this Agreement shall diminish the obligation for all arrests for any offense to be justified by individualized probable cause based on the actions of the individuals arrested.").  Given that law, policy, and the other portions of the Settlement Agreement already operate to prevent wrongful arrests similar to what Mr. Alfiky alleged, there is no reason to believe that the parties also intended to extend the extraordinary procedures embodied in subparagraph 89(h) to non-FAA situations for that purpose.

### POINT III
### APPLYING SUBPARAGRAPH 89(h) TO
### ROUTINE ARRESTS WOULD CONVEY SPECIAL PRIVILEGES
### ON EVERYONE CLAIMING TO BE A MEMBER OF THE PRESS

Plaintiffs reading of the disputed language would require a significant—and unwarranted—change in how police officers make routine arrest decisions in everyday situations.  In fact, it would give everyone claiming to be a "member of the press" special privileges that are not

---

[8] N.B.: there are two provisions of New York's Civil Rights Law numbered "79-P".  The relevant section is available here (https://www.nysenate.gov/legislation/laws/CVR/79-P) (visited May 20, 2025).

extended to other members of the public, even when the self-declared "journalist" is not engaged in newsgathering or other First Amendment activities.  Given the sweeping expansion of these types of activities through the advent of smartphones and the internet, Plaintiffs position would practically eliminate the ability of officers to make routine arrests for various low-level offenses that the New York State Legislature has included in the Penal Code.

The special consideration that Plaintiffs are seeking for putative members of the "news media" are only reasonable in situations where there is a presumption that those members are engaged in First Amendment activities that warrant special handling by the police.  Moreover, that consideration is not aimed at granting special privileges to members of the media—rather, it is aimed at protecting their First Amendment rights to gather news.  Extending the special privilege— as Plaintiffs demand—to situations where the connection to newsgathering is tenuous would not materially advance the rights protected by the First Amendment, nor serve any other legitimate purpose.

Consider a scenario where an officer has probable cause to arrest a drunk and disorderly individual under Penal Law § 240.20(2) (unreasonable noise).[9]  Or a situation where officers re- spond to a domestic incident where the subject is trespassing on private property.[10]  Under Plain- tiffs' reading, as soon as the person to be arrested produces any vaguely authentic press identifica- tion the officer would have to: (1) attempt to identify an "Incident Commander" where there is none; (2) seek DCPI input that DCPI personnel on telephone-duty are not trained to give; and (3) delay placing the arrestee in custody until they receive the unobtainable authorization.  Such a situation would not be tenable, nor would it advance any of the goals of the Settlement Agreement.

---

[9] Disorderly Conduct is one of the "Red Light offenses."  *See* Settlement Agreement at ¶ 29.

[10] Trespass is also a "Red Light offense."  *Id.*

It is axiomatic that "all persons are equal before the law". *See, e.g.*, *United States v. Mizrahi*, No. 22-CR-650 (JPO), 2024 U.S. Dist. LEXIS 35748, at *8 (S.D.N.Y.) (standard jury instruction). Yet, Plaintiffs demand that their "members" be granted special consideration in situations where none is warranted. The City of New York would not have agreed to such a demand had it been explicitly laid out in this fashion in the Settlement Agreement, and it does not read the language of subparagraph 89(h) to convey that extraordinary benefit on select members of the public who self-identify as journalists. Many other groups might attempt to avoid arrest by demanding special privileges based on their occupation. In those situations, there would be no legal basis for the demand, and even the attempt could very well violate other provisions of law. For example, if the undersigned Assistant Corporation Counsel was to produce his Law Department identification and demand special treatment during an arrest it would constitute prohibited conduct warranting dismissal from public service. *See* N.Y.C. Charter § 2604(b)(3) ("No public servant shall use or attempt to use his or her position as a public servant to obtain any . . . privilege or other private or personal advantage. . . .").

Reading the Settlement Agreement the way Plaintiffs demand would empower every self-identified "journalist"[11] to consider themselves immune to arrest for the low-level offenses defined as "Red Light offenses" in the Settlement Agreement, including riot, trespass, disorderly conduct, and criminal mischief. *See* Settlement Agreement at ¶ 29. There is no way to adopt Plaintiffs' proposed reading of the Settlement Agreement that would prevent individuals from abusing the special privileges demanded in situations where those privileges serve no legitimate interest. At the same time, accepting the City's reading of subparagraph 89(h) will not materially affect

---

[11] *See supra* at n.7.

legitimate newsgathering activities by anyone, whether or not they consider themselves official "members of the press."

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to "enforce" subparagraph 89(h) of the Settlement Agreement should be denied. The City has already implemented the plain terms of that provision in its proposed revisions to training and policy and never agreed to the more sweeping and nonsensical changes demanded by Plaintiffs. Accepting the City's reasonable interpretation of the plain language of the Settlement Agreement will accomplish the bargained-for results of the Settlement Agreement and will not deprive Plaintiffs of any of the relief that was approved by the Court.

## CERTIFICATION

Pursuant to the Court's Individual Practices & Procedures § V.D the foregoing Memorandum of Law is within the 25-page limit for opposition briefs. Further, in accordance with Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I hereby certify that the total number of words in the foregoing Memorandum of Law, inclusive of point headings and footnotes, is 4,242. I have relied on the word count function of Microsoft Word to prepare this certification.

Dated:  New York, New York
       May 21, 2025

**MURIEL GOODE-TRUFANT**
CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007
(212) 356-2423

By: _____
     Tobias E. Zimmerman
     *Senior Counsel*
     Special Federal Litigation Division

cc:    All Counsel (**via ECF**)